# The United States Court Of Appeals

# For The Ninth Circuit

YULIUS MUSTAFA,

*Plaintiff-Appellant,*

v.

YUMA REGIONAL MEDICAL CENTER, ET AL.,

*Defendants-Appellees.*

On Appeal from Final Judgment by the United States District Court for the District of Arizona, No. 2:21-cv-00161-ROS, The Honorable Roslyn O. Silver

## OPENING BRIEF OF APPELLANT

Joshua W. Carden
Arizona State Bar No. 021698
CARDEN LIVESAY, LTD.
419 E. Juanita Dr., Ste. 103
Mesa, AZ 85204
Phone: 480-345-9500
Fax: 480-345-6559
Email: joshua@cardenlivesay.com

# TABLE OF CONTENTS

Table Of Authorities .................................................................. 4

Jurisdictional Statement ............................................................ 11

Statement Of Issues ................................................................. 12

Statement Of The Case ............................................................. 13

I.    Factual Background ......................................................... 13

    A.    Dr. Mustafa's Military And Medical Experience ................... 13

    B.    Dr. Mustafa's Employment History with YRMC. ................ 13

    C.    Dr. Mustafa's 2016 Agreement With YRMC ...................... 15

    D.    Dr. Mustafa's 2019 Military Deployment .......................... 16

    E.    Dr. Mustafa's Termination ............................................ 17

II.   Procedural History ......................................................... 18

Summary Of The Argument ...................................................... 20

Argument ............................................................................... 23

I.    Introduction .................................................................. 23

II.   Standard of Review ......................................................... 23

III.  Dr. Mustafa was an "Employee" of YRMC for Purposes of Federal and State Law Prohibiting Discrimination Because of Military Service. ............................................................. 26

    A.    USERRA's Definition of Employee ................................. 27

    B.    Arizona Employment Protection Act Definition of Employee is Functionally Identical to that of USERRA. ...................... 29

    C.    The Economic Realities Establish Dr. Mustafa As An "Employee." ............................................................ 30

        1.   Highlights of the 2016 Agreement ............................... 31

            a)  Section 1.2, "Time." .......................................... 32

            b)  Section 2, "Compensation." .................................. 32

            c)  Section 1.5, "Fees, Billing and Collections" .............. 32

            d)  Section 1.6, "Medical Records." ............................ 33

            e)  Section 1.7, "Assignment of Patients" ..................... 33

f) Section 3, "Professional Liability Insurance" .............................. 33

g) Section 4, "Term" ................................................................ 33

h) Section 11, "Patient Care" ..................................................... 34

2. First Factor: YRMC's Degree of Control Over Dr. Mustafa. ............ 34

3. Second Factor: Dr. Mustafa's Opportunity for Profit or Loss. .......... 37

4. Third Factor: Dr. Mustafa's Investment in Equipment and Use of Helpers. ....................................................................... 40

5. Fourth Factor: Dr. Mustafa's Use of a Special Skill ......................... 41

6. Fifth Factor: The Degree of Permanence .......................................... 42

7. Sixth Factor: The Extent to which Dr. Mustafa's Services were an Integral Part of YRMC's business. ............................................ 45

IV. The Disputed Material Facts Show That YRMC violated USERRA and the AEPA. ................................................................. 46

A. Dr. Mustafa Established A Prima Facie Case. ........................................ 47

B. Dr. Mustafa Presented Factual Disputes Regarding YRMC's Pretextual Reasons For Termination. ...................................................... 51

1. "Anonymous Patient Complaints" .................................................... 54

2. "Dr. Mustafa Didn't Reach Out" ..................................................... 56

3. "We Don't Need You Anymore." .................................................... 56

V. Dr. Mustafa's State Law Claims Should Have Survived Summary Judgment. .......................................................................... 58

A. Disputed Material Facts Regarding Good Faith and Fair Dealing .......... 58

B. Disputed Material Facts Regarding Interference with Business Expectancies. ........................................................................ 60

C. Disputed Material Facts Regarding Aiding and Abetting. ...................... 62

Conclusion ................................................................................ 63

Addendum - Pertinent Statutes And Regulations ................................. 65

Statement Of Related Cases ............................................................ 75

Certificate Of Compliance .............................................................. 76

Certificate Of Service ................................................................... 77

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. City of Las Vegas*, 333 F.3d 1092 (9th Cir. 2003) ...................................23

*Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436 (10th Cir. 1998) .........................................................................................42

*Bar J Bar Cattle Co., Inc. v. Pace*, 763 P.2d 545, 158 Ariz. 481 (Ariz. App. 1988) ..................................................................... 61

*Belaustegui v. Int'l Longshore & Warehouse Union*, 36 F.4th 919 (9th Cir. 2022) ........................................................... 26, 27, 46

*Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528 (9th Cir. 1985)...........................26

*Brosseau v. Haugen*, 543 U. S. 194 (2004) ................................................24

*Chao v. Westside Drywall, Inc.*, 709 F.Supp.2d 1037 (D. Or. 2010)............................................................................... 37, 42

*Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030 (9th Cir. 2000), *cert. denied*, 121 S. Ct. 1403 (2001) ................................................23

*Chuang v. Univ. of Cal. Davis Bd. of Trustees*, 225 F.3d 1115 (9th Cir. 2000) ........................................................................ 25, 52

*Cole v. Swint*, 961 F.2d 58 (5th Cir. 1992) ................................................57

*Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018 (9th Cir. 2006) ............................................................................... 53

*Curley v. City of North Las Vegas*, 772 F.3d 629 (9th Cir. 2014)...........................52

*Czarny v. Hyatt Residential Mktg. Corp.*, No. 1 CA-CV 16-0577 (Ariz. App. 2018) (mem.)............................................................ 47

*Davis v. Crothall Serv. Grp., Inc.*, 961 F.Supp.2d 716 (W.D. Pa. 2013)............................................................................... 57

*Diederich v. Providence Health & Services,* 622 Fed. Appx. 613, 2015 WL 4638253 (9th Cir. 2015)(mem). ..................................... 50

*Dominguez-Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424 (1st Cir. 2000) ................................................................................. 53

*Dominguez-Curry v. Nevada Transportation Dept.,* 424 F.3d 1027 (9th Cir. 2005) ................................................................... 25

*Dorris v. TXD Services, LP,* 753 F.3d 740 (8th Cir. 2014) ............... 27

*Dube v. Likins,* 167 P.3d 93, 216 Ariz. 406 (Ariz. App. 2007) ............. 61

*E.E.O.C. v. Sears Roebuck & Co.,* 243 F.3d 846 (4th Cir. 2001) ...................... 30, 53

*El Dorado Ins. Co. v. Indus. Comm'n,* 545 P.2d 465 (Ariz. 1976) ............................. 30

*Evers v. Safety-Kleen Sys., Inc.,* No. CV 10-02556-PHX-NVW, 2012 WL 910392 (D. Ariz. March 19, 2012) ......................... 46, 47

*Fair Housing Council of Riverside County Inc. v. Riverside Two,* 249 F.3d 1132 (9th Cir. 2001) .................................................... 23

*Fishgold v. Sullivan Drydock & Repair Corp.,* 328 U.S. 275, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946) ................................................ 27

*Gillard v. Good Earth Power AZ LLC,* 2019 WL 1280946 (D. Ariz. 2019) ................................................................... 29, 40

*Goggin v. Lincoln St. Louis,* 702 F.2d 698 (8th Cir. 1983) ....................................... 57

*Hale v. State of Ariz.,* 967 F.2d 1356 (9th Cir. 1992)................................................28

*Henry v. Adventist Health Castle Medical Center,* 363 F.Supp.3d 1128 (D. Hawaii 2019) ....................................................... 38

*Hernandez v. Hughes Missile Systems Co.,* 362 F.3d 564 (9th Cir. 2004) ........................................................................... 53

*Huhmann v. Fed. Express Corp.,* 874 F.3d 1102 (9th Cir. 2017) ......................... 26, 46

*Idaho v. Hodel*, 814 F.2d 1288 (9th Cir. 1987) .........................................24

*Iontchev v. AAA Cab Inc.*, No. 12-CV-256-PHX-ROS, 2015 WL
1345275 (D. Ariz. Mar. 18, 2015)...................................................40

*Jones v. Halekulani Hotel, Inc.*, 557 F.2d 1308 (9th Cir. 1977) .................24

*Kay v. Gen. Cable Corp.*, 144 F.2d 653 (3d Cir. 1944)............................57

*Leisek v. Brightwood Corp.*, 278 F.3d 895 (9th Cir. 2002) .................. 26, 47

*Lenz v. Universal Music Corp.*, 801 F.3d 1126 (9th Cir. 2015) .................23

*Lindahl v. Air France,* 930 F.3d 1434 (9th Cir. 1991) ..............................53

*Lyons v. England*, 307 F.3d 1092 (9th Cir. 2002)....................................25

*Mace v. Willis*, 259 F.Supp.3d 1007 (D. S.D. 2017)................................57

*Mathis v. Housing Authority of Umatilla County*, 242 F.Supp.2d
777 (D. Or. 2002) ........................................................................ 31

*McGinest v. GTE Serv. Corp.,* 360 F.3d 1103 (9th Cir. 2004) .................... 23, 24, 26

*Mt. Healthy City School Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274
(1977) .......................................................................................... 47

*Murcott v. Best Western Int'l, Inc.*, 9 P.3d 1088 (Ariz. Ct. App.
2000) .......................................................................................... 47

*Murphy v. Tuality Healthcare*, 157 F.Supp.3d 921 (D. Or. 2016).......................passim

*Murray v. Principal Fin. Grp., Inc.*, 613 F.3d 943 (9th Cir. 2010) ............................30

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992) ........................29

*Neonatology Associates v. Phoenix Perinatal Assoc., Inc.*, 164 P.3d
691 (Ariz. App. 2007)...................................................................60

*Newman v. Fidelity Savings & Loan Ass'n*, 128 P. 53, 14 Ariz. 354
(Ariz. 1912) ................................................................................ 63

*Nichols v. Dept. of Veterans Affairs*, 11 F.3d 160 (Fed. Cir. 1993) ............................ 57

*Nidds v. Schindler Elevator Corporation*, 113 F.3d 912 (9th Cir. 1996) ........................................................................................... 50

*Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495 (9th Cir. 2015) ........................ 24, 25, 26

*Nolan v. Starlight Pines Homeowners Ass'n*, 167 P.3d 1277, 216 Ariz. 482 (Ariz. App. 2007) .......................................................... 58

*Noyes v. Kelly Services,* 488 F.3d 1163 (9th Cir. 2007) ............................................ 52

*Ochoa v. J.B. Martin and Sons Farms, Inc.*, 287 F.3d 1182 (9th Cir. 2002) .......................................................................................... 29

*Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493 (9th Cir. 2000) ............................................................... 50

*Payne v. Norwest Corp.*, 113 F.3d 1079 (9th Cir. 1997) ...................................... 52, 53

*Perez v. Ariz. Logistics Inc.,* CV-16-04499-PHX-DLR (D. Ariz. Mar 31, 2022) ....................................................................................... 29

*Raad v. Fairbanks North Star Borough School Dist.*, 323 F.3d 1185 (9th Cir. 2003) ............................................................................. 52

*Ray v. Henderson*, 217 F.3d 1234 (9th Cir. 2000) ..................................................... 49

*Real v. Driscoll Strawberry Assocs.*, 603 F.2d 748 (9th Cir. 1979) ...................... 28, 35

*Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000) ........................... 52

*Revit v. First Advantage Tax Consulting Servs., LLC*, No. CV 10-1653-PHX-DGC, 2012 WL 1230841 (D. Ariz. April 12, 2012) ...................................................................................................... 46

*Rivera– Melendez v. Pfizer Pharms.*, LLC, 730 F.3d 49 (1st Cir. 2013) ...................................................................................................... 27

*Rowberry v. Wells Fargo Bank NA,* No. CV-14-01801-PHX-DLR
(D. Ariz. Nov. 17, 2015) ............................................................. 47

*S.E.C. v. Phan,* 500 F.3d 895 (9th Cir. 2007)....................................... 25

*Santiago v. Phoenix Newspapers, Inc.*, 794 P.2d 138 (Ariz.
1990)(en banc) ..............................................................29, 30, 37

*Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406 (9th Cir. 1996) ............................ 24

*Scott v. Mabus*, 618 Fed. Appx. 897, 2015 WL 4440868 (9th Cir.
July 21, 2015)(mem.) ............................................................50

*Sheehan v. Dep't of the Navy*, 240 F.3d 1009 (Fed. Cir. 2001) ................................ 47

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) ............................................. 52

*Thurman v. Yellow Freight Sys., Inc.,* 90 F.3d 1160 (6th Cir.
1996) ............................................................................... 53

*Tolan v. Cotton*, 572 U.S. 650 (2014) ...............................................................24

*Torres–Lopez v. May*, 111 F.3d 633 (9th Cir. 1997)......................................... 28

*Tyler v. RE/MAX Mountain States, Inc.,* 232 F.3d 808 (10th Cir.
2000) ............................................................................... 53

*Vahey v. General Motors Co.*, 985 F.Supp.2d 51 (D.D.C. 2013).............................27

*Wagenseller v. Scottsdale Mem'l Hosp.*, 710 P.2d 1025, 147 Ariz.
370 (1985) ..........................................................................60

*Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of
Governors*, 909 P.2d 486, 184 Ariz. 419 (App. 1995) ....................................60

*Wallace v. City of San Diego* , 479 F.3d 616 (9th Cir. 2007) ................................... 46

*Wells Fargo Bank v. Arizona Laborers*, 38 P.3d 12 (Ariz. 2002)........................ 62, 63

*Williams v. Southeast Ala. Medical Center*, 2005 WL 1126766
(M.D. Ala. 2005) ...................................................................38

*Woodruff v. Peters,* 482 F.3d 521 (D.C. Cir. 2007) .................................................. 25

*Ziober v. BLB Res., Inc.*, 839 F.3d 814 (9th Cir. 2016) ............................................ 27

**Statutes and Regulations**

28 U.S.C. § 1291 ..................................................................................... 11

28 U.S.C. § 1331 ..................................................................................... 11

28 U.S.C. § 1367 ..................................................................................... 11

38 U.S.C. § 4301(a) ........................................................................... 26, 27

38 U.S.C. § 4303(2) ........................................................................... 44, 56

38 U.S.C. § 4311 ..................................................................................... 46

38 U.S.C. § 4312 ..................................................................................... 46

38 U.S.C. § 4323(b)(3) ............................................................................. 11

38 U.S.C. § 4334(a) ................................................................................. 63

A.R.S. § 23-1501 ............................................................................... 29, 46

A.R.S. § 26-167 ................................................................................. 29, 46

A.R.S. § 26-168 ................................................................................. 29, 46

20 C.F.R. § 1002.44 ................................................................................. 28

20 C.F.R. § 1002.88 ................................................................................. 56

20 C.F.R. § 1002.139(a) ........................................................................... 57

20 C.F.R. § 1002.248 ............................................................................... 55

**Secondary Sources**

H.R. Rep. No. 103-65(l) (1993) ................................................................. 27

RESTATEMENT (SECOND) OF AGENCY § 220 ........................................................ 29

RESTATEMENT (SECOND) OF TORTS § 876(b) ..................................................... 62

RESTATEMENT (THIRD) OF TORTS § 18. ............................................................ 61

USERRA Manual § 2:13 (2015) ........................................................................ 27

# JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction under 28 U.S.C. § 1331 & 38 U.S.C. § 4323(b)(3), as this case arose from Yuma Regional Medical Center's (YRMC) violation of USERRA; and under 28 U.S.C. § 1367 for the related state law claims. 5-ER-1087–93. The District Court below issued its order and judgment on January 11, 2023. 1-ER-2; -3–21. Dr. Mustafa filed his notice of appeal on February 8, 2023. 5-ER-1094. This appeal is from a final order and judgment that disposed of all parties' claims. 1-ER-2, -21. Thus, this Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

I.  Whether the trial court erred as a matter of law by refusing to grant Dr. Mustafa's Motion for Summary Judgment that Dr. Mustafa was an "employee" of YRMC for purposes of all claims. 1-ER-8–9.

II.  Whether the trial court erred as a matter of law by holding that, assuming Dr. Mustafa was an "employee" of YRMC, he failed to prove a *prima facie* case that YRMC violated USERRA or its Arizona statutory equivalent when refusing to renew his contract. 1-ER-8–15.

III.  Whether the trial court erred as a matter of law by dismissing Dr. Mustafa's Arizona remaining common law claims of a) breach of the covenant of good faith and fair dealing, b) tortious interference, and c) aiding and abetting where the record showed that renewal of a hospitalist's contract at YRMC was practically automatic and YRMC continued to hire hospitalists like Dr. Mustafa. 1-ER-16–21.

## STATEMENT OF THE CASE

### I.    FACTUAL BACKGROUND

#### A.    Dr. Mustafa's Military And Medical Experience

Plaintiff-Appellant Dr. Yulius Mustafa joined the Army Reserve in March 2007, serving therein as a physician. 5-ER-907. During his military service, Dr. Mustafa has mobilized or deployed to various locations throughout the United States and overseas, including Kuwait and most recently, to Afghanistan. 5-ER-904–05 (19:18-20:5); -907–08 (22:12-23:14). In July 2019, Dr. Mustafa was promoted to the rank of Colonel. 5-ER-906 (21:20-21). Defendant-Appellee YRMC employed Dr. Mustafa as a hospitalist beginning July 2005. 5-ER-951 (¶ 4). A Hospitalist is a physician who specializes in providing a general range of care to patients who are admitted to a hospital for care. *Id.* (¶ 3). While general practitioners in a sense, they frequently have a specialty, such as internal or family medicine. *Id.*, 5-ER-944–45 (101:13–102:5). Dr. Mustafa's specialty is internal medicine. 5-ER-951 (¶ 3).

#### B.    Dr. Mustafa's Employment History with YRMC.

Between July 2005 and October 2016, besides his military service and occasional *locums tenens* (temporary assignment) work, Dr. Mustafa worked for YRMC in the role of Hospitalist pursuant to a number of agreements entered into with various physician staffing entities. 5-ER-951 (¶ 5).

On March 18, 2005, Dr. Mustafa entered into a Physician Employee Agreement ("2005 Agreement"), in the role of a Hospitalist with "Yuma Hospitalists, PLLC," for a term of three years. 5-ER-909–10 (33:21-34:2); 5-ER-954 (2005 Agreement).

On January 1, 2009, Dr. Mustafa entered into another Physician Employee Agreement with "Hospitalists of Yuma, PLLC" with a term of one year. 5-ER-911 (37:11-20); 5-ER-966 (2009 Agreement).

Following the expiration of the Jan. 1, 2009 Agreement, Dr. Mustafa performed work for YRMC pursuant to a hospitalist staffing agreement between "IN Compass Health, Inc." and YRMC dated November 19, 2010. 5-ER-912–14 (40:9-42:18); 5-ER-976 (2010 Hospitalist Services Agreement).

On February 27, 2012, Dr. Mustafa entered into a Hospitalist Physician Employment Agreement Restated and Amended, with "24 On Physicians, P.C.," another Hospitalist staffing entity. 5-ER-916–18 (44:13-46:16); 5-ER-1009 (Hospitalist Physician Employment Agreement Restated and Amended). This agreement was amended several times, which extended Dr. Mustafa's term until 2016. 5-ER-1029–38.

While all of the above-referenced employment agreements were entered into between Dr. Mustafa and various physician staffing entities, Dr. Mustafa provided identical services to YRMC under each. 5-ER-951 (¶ 7). Under each agreement, Dr. Mustafa was required to obtain approval prior to performing any work outside of work performed for YRMC pursuant to each agreement. 5-ER-956 (§ 5.6)("Physician may only apply for medical staff privileges at hospitals and facilities approved by the Medical Director [of Yuma Hospitalists, PLLC]"); 5-ER—968 (§ 5.6)("Physician may only apply for medical staff privileges at hospitals and medical staff facilities approved by the Managers [of Hospitalists of Yuma, L.L.C.]"); 5-ER-979 (§ III.(m))("ICH covenants that no ICH Physician employed on a full-time basis

by ICH will provide outpatient services at or from any office-based medical practice located within Yuma County, Arizona during the term of this Agreement without the prior written consent of the Hospital"); 5-ER-1019 (§ 3.7.1)("Physician shall devote his or her full time and best efforts to the practice of medicine for PC and shall provide no other professional or administrative services without the PC's prior specific written consent., which shall not be unreasonably withheld."). Finally, under each agreement, Dr. Mustafa was required to perform services in a manner consistent with <u>YRMC</u>'s (not just the employing entities') policies, rules, and/or bylaws. 5-ER-955 (§ 5.3); 5-ER-967 (§ 5.3); 5-ER-978 (§III.(h)); and 5-ER-1012 (§ 3.7.2).

### C. <u>Dr. Mustafa's 2016 Agreement With YRMC</u>

As shown above, Dr. Mustafa's last agreement with a separate staffing agency company ended in 2016. Then, for the first time, YRMC presented Dr. Mustafa (and five to ten other Hospitalists) with the choice of two direct agreements to sign – one labeled an "employment agreement" and one as an "independent contractor agreement." 2-ER-143–148 (59:13-64:2); 2-ER-272–73 (56:7-60:5). Pam Orendorff, YRMC's 30(b)(6) corporate representative and contract manager who met with Dr. Mustafa about his contracts, discussed the "benefits" of the independent contractor agreement with Dr. Mustafa. 2-ER-143–45 (59:13-61:1). She later emailed management that Dr. Mustafa would likely have chosen the employment agreement had YRMC been upfront about how things might change. 2-ER-30.

Dr. Mustafa formed a single member Professional Limited Liability Company called 1ID Vanguard, PLLC and, on October 1, 2016, entered with YRMC into the

agreement at issue, entitled "Independent Contractor Agreement" ("2016 Agreement"), continuing in the role of a Hospitalist. 5-ER-918–24 (55:21-59:25; 70:22-71:9); -925 (84:9-16); 3-ER-591–601 (the 2016 Agreement itself). He testified that he chose the independent contract option for tax reasons, at the recommendation of Pam Orendorff (as previously cited) and his tax preparer. 2-ER-168–69 (84:14-85:4). However, nothing about his job duties for YRMC under this agreement varied from any of his prior agreements after he signed it. 5-ER-951 (¶ 7). Like all of his prior agreements, this agreement had an end date – here, three years from October 1, 2016. 3-ER-593 (§ 4.1).

### D. Dr. Mustafa's 2019 Military Deployment

Defendant-Appellee Dr. Bharat Magu was the Chief Medical Officer for YRMC at all relevant times.[1] 5-ER-1080–81. On January 9, 2019, the Army issued a Notice to "Soldiers and their employers," that Dr. Mustafa would be involuntarily deployed in July 2019. 2-ER-34. The fact that this notice was issued to YRMC in January 2019 was overlooked or ignored by the trial court in assessing the proximity issues. In February 2019, Dr. Magu sent an email that Dr. Mustafa was "being slowly phased out of the schedule." 2-ER-52. Dr. Magu also apparently launched an inquiry to see if there were any patient complaints about Dr. Mustafa. 2-ER-48–50, -52. Dr. Mustafa was deployed by the Army to the Middle East for approximately 8 months. *Compare* 2-ER-26 (July 12, 2019 mobilization) *with* 2-ER-56 (March 1, 2020 release)

---

[1] Dr. Mustafa conceded the dismissal of Individual Defendant Robert Trenchel (YRMC's CEO who signed his 2016 Agreement) in his Response to Motion for Summary Judgment below (Dkt. 35 at 15).

& -58 ("could start working March 2020").

Both before his deployment and during his termination meeting discussed below, Dr. Mustafa experienced direct negative comments related to his required absence, including specifically from Medical Director Mohammed Gerais that he would not be chosen for leadership due to his military service, and saying "oh, you're going out again?" when learning of the deployment. 2-ER-213–17 (129:19-133:21). Yet, the court below relegated this evidence to a footnote (1-ER-13 n.2) and concluded: "there is nothing in the facts beyond Plaintiff's claim to suggest YRMC's decision not to renew the contract had anything to do with his military service." 1-ER-10.

### E. <u>Dr. Mustafa's Termination</u>

While Dr. Mustafa was still on active deployment, on October 1, 2019 the 2016 Agreement between YRMC and Dr. Mustafa expired on its own terms. 3-ER-593 (§ 4.1). On February 27, 2020, Dr. Mustafa learned his deployment would end soon. 2-ER-56. On February 29, Dr. Mustafa emailed YRMC staff to notify them he would be returning to work as soon as March. 2-ER-58. This triggers a flurry of internal activity from YRMC, including the involvement of general counsel Robert "Bob" Siebel and explicit reference to Dr. Mustafa's deployment. 2-ER-61. Dr. Magu was updated on the meetings with Dr. Mustafa, upset to be told that he no longer has a job. 2-ER-63–64. Of note, the sender of that email clearly makes it known that Dr. Magu was in on the decision ("As we discussed, we met with Dr. Mustafa…")), and again, this email references both HR and counsel. *Id.* <u>After</u> the meeting, the "open" patient complaints are re-examined, having gone unaddressed since the prior

February when YRMC learned of Dr. Mustafa's deployment. 2-ER-48. Those "patient complaints" go completely unreferenced in any of YRMC's communications to the Department of Labor after Dr. Mustafa's USERRA complaint. 2-ER-70–71; 2-ER-73–74. And there is the strange "final meeting" email, where YRMC still contemplates using Dr. Mustafa on a part-time basis and considers a "new contract." 2-ER-55–67. Notably, Dr. Magu is reluctant. *Id.* Yet, <u>multiple</u> hospitalists are newly hired at YRMC (including specifically in February and March 2020) and others have their contracts renewed in 2020 (2-ER-291 (129:21-132:6); 2-ER-77) – the same timeframe in which YRMC tells Dr. Mustafa that <u>there is no need for him any longer</u>. 2-ER-203–05 (119:1-121:9). YRMC even puts out requests for hospitalists to work *locum tenens* (temporary assignment), to which Dr. Mustafa responds, but is rejected. 5-ER-81–87.

## II. PROCEDURAL HISTORY

Dr. Mustafa filed a USERRA complaint with the Department of Labor as of March 31, 2020. 2-ER-70. After that investigation was finalized, he chose not to request referral to the U.S. Attorney General, and instead filed suit on January 29, 2021. 5-ER-1087, -1089 ¶ 29.

In this lawsuit, Dr. Mustafa asserted a claim against YRMC for a violation of USERRA; against YRMC, CMO Dr. Magu, and CEO Dr. Trenchel for violation of the Arizona Employment Protection Act for his termination against public policy protecting "[s]ervice in the armed forces as protected by sections 26-167 and 26-168"; and for common law claims of breach of the implied covenant of good faith and fair dealing, aiding and abetting, and tortious interference with business

expectancy. 5-ER-1089–92.

Dr. Mustafa and Defendants filed cross-motions for summary judgment; Dr. Mustafa on the issue of his "employee" status, and Defendants on all claims. 1-ER-3. Dr. Mustafa conceded the dismissal of Defendant Dr. Robert Trenchel (YRMC's CEO who signed his 2016 Agreement) in his Response to Motion for Summary Judgment below (Dkt. 35 at 15).

After full briefing, the case was reassigned on September 29, 2022 to its current judge, the Honorable Roslyn O. Silver. 5-ER-1098 (Dkt. 41). On January 11, 2023, the trial court entered the Order denying Dr. Mustafa's motion and granting Defendants' motion. 1-ER-3. The judgment followed the same day. 1-ER-2. Dr. Mustafa filed his Notice of Appeal on February 8, 2023. 5-ER-1094.

## SUMMARY OF THE ARGUMENT

Dr. Mustafa easily meets the "economic realities" test for being deemed an "employee" of YRMC, instead of an independent contractor (the title on his final agreement with YRMC) for purposes of his claims.

As to the six factors of the "economic realities" test, also examined in the highly-analogous *Murphy* case from the District of Oregon: 1) YRMC exercised a high degree of control over Dr. Mustafa's daily actions; 2) Dr. Mustafa had no significant way to affect his profit and loss; 3) YRMC provided the same equipment to all hospitalists like Dr. Mustafa, regardless of whether YRMC deemed them contractors or employees; 4) Dr. Mustafa's "special skill" was no more "special" than the "employee" hospitalists; 5) the nearly-15-year relationship supported the permanence of the relationship; and 6) YRMC conceded that Dr. Mustafa's work was "integral to the business." The trial court erred as a matter of law by denying Dr. Mustafa's motion for partial summary judgment that he was an "employee" of YRMC.

As to the USERRA and state law equivalent claims, the trial court weighed, minimized, or otherwise explained away Dr. Mustafa's summary judgment evidence that his military service was a direct cause of his termination by YRMC. He was deployed in July 2019, and immediately upon his return in March 2020 he experienced an adverse action. YRMC immediately began working towards terminating Dr. Mustafa's upon receipt of his deployment orders in January 2019. Dr. Mustafa experienced hostile comments directed at his military service from YRMC management. This should have established a prima facie case that Dr.

Mustafa's non-renewal was substantially motivated by his military service and deployment. Then, the trial court erred by holding that YRMC had met its burden of demonstrating, beyond any possible inference, that YRMC would have made the same decision anyway. It is unclear whether the trial court even placed this burden on YRMC at all. Regardless, Dr. Mustafa provided evidence of YRMC's shifting explanation for his termination, the lack of notice of any patient complaints, the proximity of his deployment to negative comments and actions taken by YRMC management, YRMC's longstanding practice of regularly renewing hospitalists' contracts, and the hiring of multiple other hospitalists at the same time YRMC was telling Dr. Mustafa's that there was "no work available." There was more than enough summary judgment evidence to call YRMC's alleged reasoning into serious question and establish a USERRA and state law violation for discrimination and failing to re-hire. The trial court erred as a matter of law in dismissing these claims.

As to the state law claims, Dr. Mustafa provided evidence that YRMC breached the implied covenant of good faith and fair dealing by denying the reasonably expected benefit of their bargain – namely, the chance to renew his contract on the same terms as other hospitalists. Only he was denied this opportunity. Dr. Mustafa also demonstrated that Chief Medical Officer Dr. Bharat Magu tortiously interfered with his business expectancy to renew that contract by beginning a campaign to oust him shortly after notice of his deployment; a campaign that ended with Dr. Mustafa no longer employed with YRMC. Finally, Dr. Magu "aided and abetted" YRMC in its torts of wrongful termination and breach of the implied covenant of good faith and fair dealing by his improper involvement in the

process that left Dr. Mustafa without a job after almost 15 years of dedicated service to YRMC.

The trial court improperly weighed and discarded much of Dr. Mustafa's summary judgment evidence and that decision should be reversed and the case remanded for trial.

# ARGUMENT

## I.    INTRODUCTION

The core of this case is YRMC's poorly-disguised unlawful discrimination against Dr. Mustafa because of his military service. Despite evidence of hostility towards that service and the not-so-hidden involvement of YRMC's general counsel behind the scenes, the trial court's summary judgment gave YRMC a free pass for terminating Dr. Mustafa immediately upon his return from active duty despite YRMC's long practice of renewing contracts, its inability to provide a consistent reason for the termination, and its ongoing hostility to Dr. Mustafa performing work there even on a temporary basis. This Court should reverse this violation of Rule 56, with guidance on Dr. Mustafa's status as an "employee" under USERRA in light of other courts' careful analysis of that issue.

## II.    STANDARD OF REVIEW

This Court's standard of review of a trial court's summary judgment order is *de novo. McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004). Here, there were cross-motions for summary judgment, for which the Court "evaluate[s] each motion independently, 'giving the nonmoving party in each instance the benefit of all reasonable inferences.'" *Lenz v. Universal Music Corp.*, 801 F.3d 1126, 1130-31 (9th Cir. 2015) (quoting *ACLU v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003)); *see also Fair Housing Council of Riverside County Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) ("[e]ach motion must be considered on its own merits." (citations omitted)); *Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1037 & n.5 (9th Cir. 2000) (acknowledging the district court's responsibility to analyze

whether the record on cross-motions for summary judgment demonstrates the existence of genuine issues of material fact, even in those cases in which both parties believe that there are no material factual issues), *cert. denied*, 121 S. Ct. 1403 (2001).

And of course, a "genuine issue" of material fact will <u>only</u> be absent if, upon "viewing the evidence and inferences which may be drawn therefrom in the light most favorable to the adverse party," the movant is still clearly entitled to prevail as a matter of law. *Jones v. Halekulani Hotel, Inc.*, 557 F.2d 1308, 1310 (9th Cir. 1977). Or as the Supreme Court more recently restated it: "[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 654 (2014)(citing *Brosseau v. Haugen*, 543 U. S. 194, 195, n. 2 (2004) (per curiam)). Particularly in the context of summary judgments granted in employment cases, this Court has "emphasized the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." *McGinest*, 360 F.3d at 1112 (9th Cir. 2004)(citing *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410-11 (9th Cir. 1996)(granting of summary judgment must meet a "high standard"). In reviewing the case, this Court is not restricted to those facts relied upon by the district court, but must consider the grant of summary judgment on the basis of <u>all</u> facts in the record. *Idaho v. Hodel*, 814 F.2d 1288, 1294 n. 6 (9th Cir. 1987). This is especially true in this case where the trial court minimized Dr. Mustafa's summary judgment evidence.

Even more recently, this Court noted that "it should not take much for Appellant in a discrimination case to overcome a summary judgment motion." *Nigro*

*v. Sears, Roebuck & Co.*, 784 F.3d 495, 499 (9th Cir. 2015); *see also Chuang v. Univ. of Cal. Davis Bd. of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000). "This is because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record." *Id.*; *and see Woodruff v. Peters,* 482 F.3d 521, 526 (D.C. Cir. 2007) ("As employers rarely maintain records directly evidencing discrimination, an added measure of rigor, or caution, is appropriate in applying this standard to motions for summary judgment in employment discrimination cases.")(quotations omitted). "This is...an application of the...general rule that a judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* (internal quotations and citations omitted).

A plaintiff's own testimony on a material fact in dispute, even if "self-serving," is sufficient to establish admissible evidence sufficient to preclude an employer's motion for summary judgment on that issue, so long as a foundation for such belief is provided and it is not merely a conclusory statement. *Nigro,* 784 F.3d at 497; *Dominguez-Curry v. Nevada Transportation Dept.*, 424 F.3d 1027, 1035-1036 (9th Cir. 2005); *Lyons v. England*, 307 F.3d 1092, 1115 (9th Cir. 2002).

> Particularly, in *Nigro* this Court said:
>
> We have previously acknowledged that declarations are often self-serving, and this is properly so because the party submitting it would use the declaration to support his or her position. *S.E.C. v. Phan,* 500 F.3d 895, 909 (9th Cir. 2007) (holding that the district court erred in disregarding declarations as "uncorroborated and self-serving"). Although the source of the evidence may have some bearing on its

credibility and on the weight it may be given by a trier of fact, the district court may not disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature."

*Id.* at 497. Furthermore, summary judgment should be denied if a party's knowledge or state of mind is at issue because the resolution of such issues is a jury function. *Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528, 531 (9th Cir. 1985) (and cases cited); *see also McGinest,* 360 F.3d at 1112 (heightened care required on summary judgment in cases involving "motive"). The *McGinest* panel also "emphasized the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." *Id.*

## III. DR. MUSTAFA WAS AN "EMPLOYEE" OF YRMC FOR PURPOSES OF FEDERAL AND STATE LAW PROHIBITING DISCRIMINATION BECAUSE OF MILITARY SERVICE.

USERRA was enacted in 1994 "to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service." 38 U.S.C. § 4301(a)(1). USERRA is a successor statute to prior federal laws that also sought to protect the rights of servicemembers returning to civilian employment. *Belaustegui v. Int'l Longshore & Warehouse Union*, 36 F.4th 919, 923 (9th Cir. 2022)(citing *Huhmann v. Fed. Express Corp.*, 874 F.3d 1102, 1108 n.4 (9th Cir. 2017) (discussing predecessor statutes)). Through USERRA, Congress endeavored to "clarify, simplify, and, where necessary, strengthen the existing veterans' employment and reemployment rights provisions." *Id.* (quoting *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (quotations omitted)). As a law advancing the interests of veterans,

USERRA is "liberally construed for the benefit of those who left private life to serve their country in its hour of great need." *Id.* (citing *Ziober v. BLB Res., Inc.*, 839 F.3d 814, 819 (9th Cir. 2016) (quoting *Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 285, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946)).

Other circuits concur: USERRA is to be broadly construed in favor of its military beneficiaries. *Dorris v. TXD Services, LP*, 753 F.3d 740, 745 (8th Cir. 2014). As the latest in a series of laws protecting veterans' employment and reemployment rights, USERRA is to be interpreted in light of the large body of case law that had developed under previous iterations of federal laws protecting veterans' employment rights to the extent prior caselaw is not inconsistent with USERRA. *Vahey v. General Motors Co.*, 985 F.Supp.2d 51, 57 (D.D.C. 2013) (quoting *Rivera–Melendez v. Pfizer Pharms.*, LLC, 730 F.3d 49, 54 (1st Cir. 2013); 38 U.S.C. § 4301(a)).

## A.    USERRA's Definition of Employee

In passing the Uniformed Services Employment and Reemployment Rights Act ("USERRA" or "the Act"), Congress made clear its intent that the Act "would define 'employee,' in the same expansive manner as under the Fair Labor Standards Act ... and the issue of independent contractor versus employee should be treated in the same manner as under the Fair Labor Standards Act." *Murphy v. Tuality Healthcare*, 157 F.Supp.3d 921, 925 (D. Or. 2016) (citing H.R. Rep. No. 103-65(l), at 2454 (1993) and USERRA Manual § 2:13 (2015)("In enacting USERRA, Congress expressed an intent that the issue of whether a person is an independent contractor or employee be decided in the same manner as under the FLSA.")) "The FLSA's

definition of employee has been called the broadest definition that has ever been included in any one act." *Torres–Lopez v. May*, 111 F.3d 633, 638 (9th Cir. 1997) (internal quotations omitted). Under the FLSA, the "common law concepts of 'employee' and 'independent contractor' are not conclusive determinants of the FLSA's coverage." *Real v. Driscoll Strawberry Assocs.*, 603 F.2d 748, 754 (9th Cir. 1979). Rather, this Court applies the "economic realities" test, under which "employees are those who *as a matter of economic reality* are dependent upon the business to which they render service." *Id.* (emphasis in original). "Under the economic realities test, the existence of a contract describing an individual as an independent contractor is not a dispositive or controlling consideration." *Murphy*, 157 F.Supp.3d. at 925-26 (citing *Real*, 603 F.3d at 755). "Whether an employer-employee relationship existed under the FLSA is a question of law." *Hale v. State of Ariz.*, 967 F.2d 1356, 1360 (9th Cir. 1992)

There are six factors in determining whether an individual is an independent contractor or employee under the economic realities test:

> 1) The degree of the alleged employer's right to control the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; 4) whether the service rendered requires a special skill; 5) the degree of permanence of the working relationship; and 6) whether the service rendered is an integral part of the alleged employer's business.

*Id.* at 926; *see also* 20 C.F.R. § 1002.44 (USERRA regulation adopting six part-test)

Importantly, "[n]o single factor is dispositive; rather, whether an individual is an employee under this inquiry depends upon the circumstances of the whole

activity." *Id.* (citations and internal quotations omitted). With that said, "the court can answer this question on summary judgment only where the facts material to the inquiry are undisputed." *Perez v. Ariz. Logistics Inc.,* CV-16-04499-PHX-DLR at *3 (D. Ariz. Mar 31, 2022) (citing *Gillard v. Good Earth Power AZ LLC*, 2019 WL 1280946, *7 (D. Ariz. 2019)). The material facts on this issue are undisputed.

## B. Arizona Employment Protection Act Definition of Employee is Functionally Identical to that of USERRA.

Dr. Mustafa is likewise an "employee" for purposes of the Arizona Employment Protection Act, which similarly forbids discrimination on the basis of military service. *See* A.R.S. §§ 23-1501(A)(3)(c)(vii), 26-167, 26-168. This Court has previously recognized that Arizona has adopted the approach set out in Section 220 of the RESTATEMENT (SECOND) OF AGENCY for determining whether an individual is an "employee" under Arizona law. *Ochoa v. J.B. Martin and Sons Farms, Inc.*, 287 F.3d 1182, 1192 (9th Cir. 2002)(citing *Santiago v. Phoenix Newspapers, Inc.*, 794 P.2d 138, 145 (Ariz. 1990)(en banc)). Arizona courts look to the following eight factors: 1. The extent of control exercised by the master over details of the work and the degree of supervision; 2. The distinct nature of the worker's business; 3. Specialization or skilled occupation; 4. Materials and place of work; 5. Duration of employment; 6. Method of payment; 7. Relationship of work done to the regular business of the employer; 8. Belief of the parties. *Id.* (citing *Santiago*, 794 P.2d at 142); *see also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322-23 (1992) (noting that when a statute refers to "employment" without further discussion, the common law definition of employment applies and referencing the RESTATEMENT (SECOND) OF

AGENCY). No one factor is determinative; courts must look to the totality of the facts and circumstances. *Santiago* at 141; *see also El Dorado Ins. Co. v. Indus. Comm'n*, 545 P.2d 465, 467 (Ariz. 1976)). This Court has also observed that "there is no functional difference" between the economic realities test described above and the common law agency test adopted by Arizona. *Murray v. Principal Fin. Grp., Inc.*, 613 F.3d 943, 945 (9th Cir. 2010)). The *Santiago* decision also incorporates the belief of the community as to whether a particular relationship would reflect "the relation of master and servant." 794 P.2d at 145. A hospitalist making rounds to patients inside of a hospital should qualify easily for that belief.

C. **The Economic Realities Establish Dr. Mustafa As An "Employee."**

A few threshold facts that are important to this overall question: at no time during Dr. Mustafa's approximately-15-year tenure did Dr. Mustafa's job as a hospitalist ever change, whether he was classified as 1099 or W-2. 2-ER-251 (167:17-25). After most of the "5 to 10" hospitalists came "in house" in the 2016 time frame, YRMC presented Dr. Mustafa (and the other hospitalists) with the option to become either employees or contractors (and at least on the surface YRMC did not care which was chosen). 2-ER-272–73 (53:1-58:8). However, it appears that Dr. Mustafa was steered towards the contractor role with YRMC's assurance that the work and number of patients would stay the same. 2-ER-143–48 (59:13-61:1; 61:14-63:1; 63:19-64:2); -154 (70:2-12); -250–51 (166:20-167:7). YRMC's (30(b)(6)) representative disclosed later in an internal email that she did not notify or "caution" Dr. Mustafa that he would potentially lose any shifts if he became a contractor. 2-ER-29. She also admitted her belief that if that had been discussed, <u>Dr. Mustafa would likely have</u>

opted for the employment contract. *Id.*

YRMC relied heavily below on either the basic contract language or Dr. Mustafa's "choice" to sign an independent contractor agreement rather than an employment agreement, instead of focusing on the "realities. *See Real*, 603 F.2d at 755 ("[t]he subjective intent of the parties to a labor contract cannot override the economic realities...."). Even an individual who desires to be an independent contractor can still be found to be an employee under the law based on the economic realities test. *Mathis v. Housing Authority of Umatilla County*, 242 F.Supp.2d 777, 785-86 (D. Or. 2002) (and appellate cases cited). For that reason, "contractual intention is not a dispositive consideration" in the independent contractor versus employee analysis. *Id.* at 785 (citing cases), nor can the subjective "desire" to be an independent contractor alter the economic reality. *See id.* at 786 ("[T]he issue of [the plaintiff's] desire to be an independent contractor does not alter the economic reality that she was an employee.")

As the Court will see, once the factors are applied according to case law, and in light of the undisputed facts in the record, Dr. Mustafa is an "employee" for purposes of USERRA and the AEPA. It was error for the trial court to refuse to grant summary judgment on this point.

### 1. Highlights of the 2016 Agreement.

The 2016 Agreement itself contains several provisions worth pointing out up front that will be indicative of an employer-employee relationship when held against the factors.

### a) Section 1.2, "Time."

The 2016 Agreement provided that while Dr. Mustafa had the "right to establish the days and hours during which [he] [would] provide…services," such schedule was "subject to approval by [Defendant] and per normal hours of operation." 3-ER-591 (§ 1.2). While Section 1.2 states that Dr. Mustafa would not be "guaranteed" a minimum number of hours or patients, it also provided that "YRMC's expectations are that Physician shall be available to provide the services as business operational needs require, and the scheduling of the services shall take priority over Physician's other professional activities or employment." *Id.*

### b) Section 2, "Compensation."

The 2016 Agreement states that Dr. Mustafa would be paid on an hourly basis, with the amount depending on whether he was assigned a day shift or a night shift. 3-ER-592 (§ 2.1). Dr. Mustafa was also eligible for between $50.00 and $100.00 for each admission or discharge "encounter" with a patient above a particular "shift target," which was determined by YRMC. 3-ER-593 (§§ 2.2 and 2.3). To Dr. Mustafa's knowledge however, this bonus system was not actually used. 5-ER-952 (¶ 10).

### c) Section 1.5, "Fees, Billing and Collections"

Under the 2016 Agreement, Dr. Mustafa provided an "unconditional reassignment" of "(i) all fees and funds owing or collected for Services provided by [him] pursuant to [the] Agreement…, [and] (ii) any other monies or accounts receivable for Services provided by [him] pursuant to [the] agreement…", and agreed that "any such monies or accounts receivable shall be the exclusive property

of YRMC." 3-ER-592 (§ 1.5).

### d) Section 1.6, "Medical Records."

Section 1.6 of the 2016 Agreement sets forth strict requirements with respect to YRMC's sole ownership of all medical records relating to the patients seen by Dr. Mustafa. 3-ER-592 (§ 1.6).

### e) Section 1.7, "Assignment of Patients"

The 2016 Agreement states very clearly that Dr. Mustafa had no control over the assignment of his patients for whom services were provided under its term; only YRMC had the authority to "direct and control" patient assignments. 3-ER-592 (§ 1.7).

### f) Section 3, "Professional Liability Insurance"

Under Section 3, YRMC agreed to provide Dr. Mustafa with professional liability insurance beginning on his first day of work and ending upon the termination of the Agreement. 3-ER-593 (§ 3.1). The Agreement further provided that such coverage would "not extend to 'moonlighting' activities that Physician may perform which are outside the scope of the services provided under this Agreement." *Id.*

### g) Section 4, "Term"

The 2016 Agreement provides that "[t]he term of this Agreement shall commence on October 1, 2016 ('Start Date'), and shall continue through a term mutually agreed upon, but not longer than three (3) years, unless YRMC and Physician agree mutually to amend the terms…" 3-ER-593 (§ 4.1). The 2016 Agreement further provides that it may be terminated earlier by YRMC for a variety of enumerated reasons and by Dr. Mustafa for material breach of its terms. 3-ER-

593–94 (§§ 4.2 and 4.3). Either party could terminate its terms "without cause" upon thirty days prior written notice. 3-ER-594 (§ 4.4).

### h) Section 11, "Patient Care"

The 2016 Agreement contains a section addressing "Patient Care," which begins by stating that "[n]othing in this Agreement shall be interpreted to dictate Physician's practice of medicine, delivery of direct patient care or independent judgment…and "[]physician shall have complete control over the diagnosis and treatment of patients …." 3-ER-598 (§ 11). However, this section goes on to state that, "Physician's treatment and diagnosis of patients will be consistent with any written rules and regulations promulgated by YRMC and, if applicable, the facility(s) dealing with the general treatment of patients." *Id.*

With the text and context of the 2016 Agreement in hand, the economic factors themselves show that Dr. Mustafa was an employee for many of the same reasons announced by the District Court of Oregon in *Murphy v. Tuality Healthcare*, 157 F.Supp.3d 921 (D. Or. 2016) (holding that an anesthesiologist was an employee despite an "independent contractor agreement" and even billing and collecting from his patients directly). As it represents the most factually similar case in this Circuit, the *Murphy* court's analysis will also be examined with each factor below.

### 2. First Factor: YRMC's Degree of Control Over Dr. Mustafa.

In their Motion below, YRMC argued three facts below for this factor: 1. The "independent contractor" label on the contract; 2. that Dr. Mustafa got to decide which YRMC-assigned patients he would see first and what services they might need and when to discharge them; and 3. that he had the "right" (important word) to

establish the days and hours he would work. Dkt. 31 at 8-9. Upon closer examination of the context, these facts do not actually favor YRMC.

First, the title of the "contractor" agreement is of course completely non-dispositive and should be disregarded for this factor. *See Real*, 603 F.2d at 755. Second, the control YRMC exerted was <u>pervasive</u>: Dr. Mustafa was required to provide all diagnosis and treatment to patients assigned to him by YRMC <u>the same way</u> hospitalists YRMC designated as "employees" were assigned patients – 2-ER-263 (17:2-25); -267(35:21-36:2); 2-ER-181–82 (97:3-24; 98:2-7). And he had to do so in a manner consistent with any written rules and regulations promulgated by YRMC, its Medical Staff Bylaws, its Behavioral Code of Conduct and, if applicable, the facility(s) dealing with the general treatment of patients. 2-ER-295–96 (148:19-25; 149:1-8); 3-ER-598 (§ 11). This even included such specific rules on whether Dr. Mustafa could leave the hospital during the shift; how Dr. Mustafa was to sit rather than stand in the patients' rooms; when he could transfer patients; and the time by which Dr. Mustafa was instructed to discharge patients. 2-ER-183 (99:4-13), -186–89 (102:19-105:3). Similarly, Dr. Mustafa was required by YRMC to enter information in YRMC's medical records regarding his assigned patients. 2-ER-179–180 (95:10-25; 96:1-3). Additionally, Dr. Mustafa had no control over the patients that were assigned to him and, similar to the plaintiff in *Murphy*, did not "self-refer" patients. 5-ER-952 (¶ 9). Dr. Mustafa also periodically attended Hospitalist staff meetings. 5-ER-1062–63 (25:20-25; 26:7-13). YRMC also apparently included Dr. Mustafa in their computerized "complaint or accolade" system known as "Midas" – along with all other hospitalists. 2-ER-275–76 (68:25-69:21).

Third, regarding YRMC's control over Dr. Mustafa's schedule, consistent with the 2016 Agreement, Dr. Mustafa would provide his availability to work at YRMC to a scheduler, typically a month in advance. 5-ER-929–31 (76:3-78:1-5); -936–37 (86:22-87:1). Based on such availability, YRMC would then schedule Dr. Mustafa for particular days on a particular shift. *Id.* Generally, Dr. Mustafa was available seven days a week and provided his availability as such. 5-ER-931 (78:2-5). During his time working at YRMC, he typically worked over 200 hours per month when he was not deployed. 5-ER-951 (¶ 7). Notably, because YRMC had complete control of such scheduling based on Dr. Mustafa's availability, he periodically expressed dissatisfaction with the shifts to which he was assigned. 2-ER-31–32; 5-ER-925–28 (72:1-75:1-8) -932–33 (79:6-80: 24). In general, Dr. Mustafa worked more than 40 hours a week on behalf of YRMC. 5-ER-934 (81:3-4). With that said, Dr. Mustafa did have the ability to decline shifts—but only, of course, those already offered to him by YRMC based on his general availability. 5-ER-938 (89:2-20); 5-ER-1072–73 (62:20-63: 16). Thus, the "right" to establish his own hours and days was not actually a "right" at all –only YRMC approved which pre-defined shifts and days he could work. 2-ER-28–32.

Added to this litany, YRMC did not identify any way in which, once the shifts were assigned to Dr. Mustafa, the hospital treated Dr. Mustafa <u>any differently</u> than the "employee" hospitalists. In fact, YRMC practically conceded this point in footnote 2 of Defendants' Response to Dr. Mustafa's Motion below – <u>all</u> hospitalists were expected to follow the same rules whether they signed employee agreements or contractor agreements. Dkt. 34 at 10 n. 2. "A strong indication of control is an

employer's power to give specific instructions with the expectation that they will be followed." *Santiago*, 794 P.2d at 142-43, 164 Ariz. at 509-10.

**The *Murphy* case -** The *Murphy* court began its analysis of the control factor by noting that, "[c]ourts generally consider the degree of supervision an alleged employer has over an individual in determining the extent of the alleged employer's right to control the individual, although the fact that an individual is not supervised in detail at all times does not necessarily mean the individual is an independent contractor." 157 F.Supp.3d. at 926 (citing *Chao v. Westside Drywall, Inc.*, 709 F.Supp.2d 1037, 1064 (D. Or. 2010)). Finding that this factor weighed in favor of a determination that Murphy was an employee, the court relied on the fact that he was not permitted to "self-refer" patients, was required to accommodate surgeon preferences when administering anesthesia, and was expected to respond to directives from the Medical Director. 157 F.Supp.3d. at 926. Further, "[t]he ASA required [him] to work full-time at the hospital…according to the schedule set by [the Medical Director]…" and he "also had to receive permission from [the Medical Director] to adjust [his] schedule." *Id.* Finally, pursuant to the terms of the ASA, Murphy "was required to attend regular anesthesia and surgical service meetings." *Id.* When compared with the facts above, the "control" factor clearly favors Dr. Mustafa.

### 3. *Second Factor: Dr. Mustafa's Opportunity for Profit or Loss.*

The 2016 Agreement required that Dr. Mustafa provide YRMC with an "unconditional assignment" of fees resulting from services provided by him to the patients that were assigned to him by YRMC. 3-ER-592 (§ 1.5) Dr. Mustafa was not

permitted to independently bill patients he saw at YRMC; all services provided were billed and collected by YRMC, again suggesting employment status. 5-ER-1075–76 (84:21-85:4); *Cf. Murphy*, 157 F.Supp.3d at 927 (finding that opportunity for profit and loss factor weighed in favor of independent contractor status where plaintiff billed his own patients).[2]

Furthermore, per the express terms of the 2016 Agreement, 3-ER-593 (§ 3.1), the fact that YRMC paid for Dr. Mustafa's medical malpractice insurance indicates employee status. *Cf. Henry v. Adventist Health Castle Medical Center,* 363 F.Supp.3d 1128, 1135 (D. Hawaii 2019) (noting that the fact that defendant did not provide plaintiff with employee benefits, "such as malpractice insurance, paid vacation, sick leave, parental leave, paid holidays, a pension plan, retirement benefits, health insurance, worker's compensation, or withholding of social security taxes," supported independent contractor status) (Title VII case); *Williams v. Southeast Ala. Medical Center*, 2005 WL 1126766, *3 (M.D. Ala. 2005) ("The contract's allocation of responsibility for payment of taxes and malpractice insurance premiums to [plaintiff] also suggests his status as an independent contractor.") (constitutional claim).

YRMC argued four facts below: 1. "lack of a salary"; 2. "right to establish days/hours worked"; 3. 1099 status; and 4. the ability to work elsewhere. Dkt. 31 at 9-10. First, the contrast in *Murphy* (cited inexplicably by YRMC as favoring them on

---

[2] While there is language within the Oct. 1, 2016 Agreement regarding payments for exceeding target shift "encounters," Dr. Mustafa does not believe he received any such payments. 5-ER-952 (¶ 10).

this point) was <u>not</u> "hourly" vs. "salary" – it was that Dr. Murphy did not get either <u>because he billed and collected payment directly from patients.</u> 157 F.Supp.3d at 927. In contrast, Dr. Mustafa received income based solely on time spent, not speed or efficiency. 3-ER-592 (§ 2.1).

Second, Dr. Mustafa did not have any such "right" to establish his own days/hours worked. 2-ER-160–62 (76:3-78:5); -170–71 (86:22-87:1). Even the contract language immediately caveats the alleged "right" with "subject to approval by YRMC." 3-ER-591 (§ 1.2). As cited in the previous factor, Dr. Mustafa was generally available seven days a week. His one week on, one week off schedule was the same before and after the latest contract. 2-ER-174–75 (90:5-18; 91:9-20). Furthermore, Dr. Mustafa testified that there was an ongoing expectation that the hospitalists would coordinate their shifts (2-ER-31–32) and their holidays/vacations fairly. 2-ER-171–73 (87:2-88:11; 89:9-20). <u>Finally, Dr. Mustafa testified that the only shifts he remembers turning down were during his monthly army reserve trainings.</u> 2-ER-248 (164:11-22); -224 (140:12-14).

Third, <u>of course</u> Dr. Mustafa received a 1099 for the payments YRMC made, but that was a <u>result</u> of YRMC's classification, not the cause of it. Allowing the tax form itself to be probative of anything is to eviscerate the holding of *Real* as to labels, and allow the tail to wag the dog.

Fourth, "working elsewhere" was allowed throughout Dr. Mustafa's tenure at YRMC, but the 2016 Agreement demonstrated that YRMC didn't want to share priority with anyone else. 3-ER-591 (§ 1.2). But Dr. Mustafa did perform scattered *locums tenens* work whether he was working as a W-2 employee for one of the staffing

companies or under the 2016 Agreement with YRMC. 2-ER-97–98 (13:9-14:9); -129–30 (45:24-46:22).

What lower courts are examining here is "whether the putative employee has the 'freedom to develop their own business.'" *Gillard*, No. CV-17-01368-PHX-DLR at * 14 (quoting *Iontchev v. AAA Cab Inc.*, No. 12-CV-256-PHX-ROS, 2015 WL 1345275, at *5 (D. Ariz. Mar. 18, 2015)). Here, Dr. Mustafa made no more money on "efficiency" than his usual hourly rate, and YRMC has offered no evidence of any possible increased money to Dr. Mustafa as a result of "efficiency." This set of facts does not help YRMC, and the factor continues to favor Dr. Mustafa as an "employee."

**The *Murphy* case -** Turning to Murphy's opportunity for profit or loss, the court concluded that this factor weighed "slightly" in favor of his status as an independent contractor. 157 F.Supp.3d. at 927. While Murphy was responsible for billing his own patients and collecting payment, the ASA and related policies placed limits on the amount he could charge. *Id.* Further, he was not permitted to "self-refer" patients and was paid stipends pursuant to the PDA. *Id.* Notwithstanding this, the court ultimately concluded that on balance, this factor weighed in favor of independent contractor status. *Id.* Dr. Mustafa contends that, unlike *Murphy*, the Agreement verbiage here that "assigned" all proceeds to YRMC is enough to tip the balance back towards "employee" status.

### 4. *Third Factor: Dr. Mustafa's Investment in Equipment and Use of Helpers.*

Aside from his stethoscope, Dr. Mustafa provided no other equipment in

connection with the performance of his work on behalf of YRMC. 5-ER-952 (¶ 8); 5-ER-1074 (83:13-20). During Dr. Mustafa's work under the 2016 Agreement (and prior thereto), YRMC provided Dr. Mustafa with, among other tools and equipment, the following used in connection with examinations of patients: otoscopes, tongue depressors, personal protective equipment (gowns, face shields, and medical gloves, etc.), vital signs machines, access to electronic medical records systems, and access to laboratory, x-ray, and pharmacy services. 5-ER-952 (¶ 8). YRMC acknowledged that Dr. Mustafa shared all YRMC-provided resources with other hospitalists regardless of classification. 2-ER-268–69 (38:22-41:21). This factor clearly favors Dr. Mustafa.

**The *Murphy* case -** The court disposed quickly of this factor, finding that "[u]nder the ASA, Tuality provided [Murphy] with the vast majority of the equipment and supplies used by [him] and all of the support staff"; concluding that this factor weighed in favor of "employee" status. 157 F.Supp.3d. at 927.

### 5. *Fourth Factor: Dr. Mustafa's Use of a Special Skill*

As in *Murphy*, the parties here do not truly dispute that Dr. Mustafa's duties involved the use of a special skill, *i.e.*, the practice of medicine. While this would normally weigh in favor of independent contractor status; here, YRMC's exercise of control over Dr. Mustafa's performance of that skill tips the analysis on the side of "employee" as it did in *Murphy*.

YRMC pointed primarily to the "complete control" contract language rather than the actual day to day experience of the hospitalists regardless of classification. Dkt. 31 at 11. But the actual facts are more nuanced. "The fact that an individual has

technical skills, however, does not necessarily indicate that they are an independent contractor; rather, courts also look to whether technical skills are used in an independent manner." *Murphy*, 157 F.Supp.3d at 927. (citing *Chao*, 709 F.Supp.2d at 1065 and *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1443 (10th Cir.1998) (finding that although plaintiff welders were highly skilled and were not told by defendant how to complete a particular weld, they were told by the defendant where and when to weld, and thus did not exercise their skills in an independent manner)). Dr. Mustafa has provided evidence with the control factor above that YRMC's control far outweighed any "independent" use of his (or the other hospitalists') "special skill."

**The *Murphy* case -** With respect to Murphy's use of a special skill, the court acknowledged the parties' agreement that as a general rule, a physician's administration of anesthesia required a special skill set. 157 F.Supp.3d. at 927. However, the court concluded that due to the level of control exhibited by the hospital over Murphy, this factor <u>weighed in favor of employment status</u>. *Id.* (reasoning that because Murphy worked pursuant to a schedule provided by the Medical Director, he "did not use his anesthesia skills in an independent manner."). So it is in this case.

### 6. *Fifth Factor: The Degree of Permanence*

The degree of permanence in the instant case weighs in favor of finding that Dr. Mustafa was an employee under the 3-year 2016 Agreement—and arguably even beforehand. At the time of the end of his 2016 Agreement with YRMC in 2019, Dr. Mustafa had worked at YRMC for nearly 15 years. 5-ER-951 (¶ 5). While YRMC will

undoubtedly argue that such arrangements did not create an employment relationship with it, the fact of the matter remains that Dr. Mustafa had a long-term unchanging relationship with YRMC. As Dr. Mustafa testified:

> Q. Okay. In every iteration of the contracts that we've seen today that [counsel] put in front of you, did the nature of your job with Yuma Regional medical Center ever change?
>
> A. No. So from one contract to another, from day to day, the work is the same. The employer might be different from hospital to hospital, from Yuma [H]ospitalist, In Compass Health, 24 On or YRMC, whatever is the entity, whatever's the contract, the work is exactly the same.

5-ER-947 (167:17-25).

Also belying the notion that there was any meaningful difference between working in the role as a Hospitalist "independent contractor" versus as an employee for YRMC—aside from perhaps the tax consequences—is the fact that YRMC freely gave Dr. Mustafa the "choice" as to which agreement he wished to enter into prior to his execution of the 2016 Agreement. 5-ER-1066–71 (53:1-58:8). YRMC did not care enough what his status was to choose the form of agreement – presumably because they knew that his work would be the same regardless.

While Dr. Mustafa acknowledges that the 2016 Agreement contains provisions allowing for termination before its expiration, the realities of the parties' long term, ongoing relationship warrant a finding that Dr. Mustafa was indeed an employee.

**The *Murphy* case -** The court acknowledged that the fact that the parties' agreement could be terminated at-will with 90-days of advanced notice tended to

support that Murphy was an independent contractor. 157 F.Supp.3d at 927-28. However, noting the length of the period that Murphy was engaged with Tuality, as well as the fact that the PDA auto-renewed year-to-year unless otherwise agreed to between the parties, the court concluded that this factor weighed slightly in favor of a finding that Murphy was an employee. *Id.*

So, on the one hand, the agreement did expire "by its own terms" as argued below, however, the consistent practice by YRMC was to contact the providers and "renew their contracts" (not "sign new contracts") and that is the language used consistently by YRMC back then and now even in deposition. 2-ER-54; -60–61, -63–64, -282 (95:13-15) and -284 (102:14-103:25). Dr. Mustafa also pointed out that there were times (and the gaps in the timing of the various agreements in the record support this) when he was scheduled to work even after a contract in place had expired and it was simply dealt with after the fact. 2-ER-138–39 (54:9-55:6). This longstanding renewal practice of YRMC is one of the very benefits of employment of which Dr. Mustafa was unlawfully deprived. *See* 38 U.S.C. § 4303(2)("benefit of employment" means "the terms, conditions, or privileges of employment, including any advantage, profit, privilege, gain, status, account, or interest (including wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice." (emphasis added). For purposes of this factor, Dr. Mustafa should receive the benefit of the inference; not YRMC.

### 7. Sixth Factor: The Extent to which Dr. Mustafa's Services were an Integral Part of YRMC's business.

YRMC conceded this factor below. Dkt. 31 at 11-12. YRMC testified that Hospitalists are an integral part of its business and are "the primary care provider of an unassigned patient while they are within the walls of Yuma Regional." 5-ER-1059–61 (16:13-17:1; 19:1-6).

**The Murphy case -** In *Murphy*, the plaintiff was a specialist anesthesiologist but still "integral." 157 F.Supp.3d at 922, 928. In contrast, Dr. Mustafa was a hospitalist for YRMC throughout his long tenure, serving a broader range of patients, and thus was more integral to the day-to-day operations of YRMC.

**\*\*\*\*\*\*\***

After examining each of the foregoing factors, the *Murphy* court held that "[d]rawing all reasonable inferences in favor of Tuality, the economic realities of the relationship between [Murphy] and Tuality show that [he] was Tuality's employee for the purposes of USERRA." 157 F.Supp.3d at 928. In reaching this conclusion, the court also noted the "'expansive manner' in which Congress intended the term 'employee' to be construed under USERRA…" 157 F.Supp.3d at 928. Using the same analysis, Dr. Mustafa's "employee" status under these factors is even more clear. The trial court declined to make such a holding, but merely assumed that Dr. Mustafa was an employee before addressing the merits of his claims. Dr. Mustafa asks this Court to hold that he was an employee of YRMC as a matter of law to facilitate efficiency on remand.

## IV. THE DISPUTED MATERIAL FACTS SHOW THAT YRMC VIOLATED USERRA AND THE AEPA.

As an "employee" of YRMC, Dr. Mustafa is entitled to be free of discrimination for his military service and entitled to re-employment at his return therefrom. 38 U.S.C. §§ 4311 & 4312 (*see* Addendum). The state law protections are similar. A.R.S. §§ 23-1501, 26-167, 26-168 (*see* Addendum).

To prove a violation of USERRA for discrimination, "[a]n employee first has the burden of showing, by a preponderance of the evidence, that his or her protected status was a substantial or motivating factor in the adverse employment action; the employer may then avoid liability only by showing, as an affirmative defense, that the employer would have taken the same action without regard to the employee's protected status." *Belaustegui*, 36 F.4th at 924 (quoting *Huhmann*, 874 F.3d at 110; and *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007)); U.S.C. § 4311(c)(1).

As to the AEPA, this same "two step" motivating factor analysis has been applied (despite a strange dearth of Arizona court precedent) by the District of Arizona in AEPA cases. *See Revit v. First Advantage Tax Consulting Servs., LLC*, No. CV 10-1653-PHX-DGC, 2012 WL 1230841, at *4-5 (D. Ariz. April 12, 2012); *Evers v. Safety-Kleen Sys., Inc.*, No. CV 10-02556-PHX-NVW, 2012 WL 910392, at *9-10 (D. Ariz. March 19, 2012). These courts concluded that Arizona courts would adopt a First Amendment-esque retaliation approach for two reasons: (1) the "substantial or motivating factor" test most closely resembles the test applied by Arizona courts in whistleblowing retaliation cases before the adoption of the AEPA, *see, e.g., Murcott*

*v. Best Western Int'l, Inc.*, 9 P.3d 1088, 1099 (Ariz. Ct. App. 2000), and (2) by asking whether the employer would have taken the same action regardless of the employee's whistleblowing, the First Amendment retaliation test "ensures that employees will not blow the whistle simply to put themselves in a more secure position than they would have been otherwise." *Evers*, 2012 WL 910392, at *10 (citing *Mt. Healthy City School Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 285-86 (1977)); *see Rowberry v. Wells Fargo Bank NA,* No. CV-14-01801-PHX-DLR, at *8-10 (D. Ariz. Nov. 17, 2015)(adopting the First Amendment retaliation approach); *but see Czarny v. Hyatt Residential Mktg. Corp.*, No. 1 CA-CV 16-0577 at * 4 ¶¶ 11-13 (Ariz. App. 2018) (mem.)(adopting with little analysis the *McDonnell-Douglas* three-step approach at the request of the parties).

### A.  Dr. Mustafa Established A Prima Facie Case.

The trial court should have deemed Dr. Mustafa easily able to meet the low bar for a prima facie case. This Court has held that:

> discriminatory motivation of the employer "may be reasonably inferred from a variety of factors, including proximity in time between the employee's military activity and the adverse employment action, inconsistencies between proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses."

*Leisek v. Brightwood Corp.*, 278 F.3d 895, 900 (9th Cir. 2002)(quoting *Sheehan v. Dep't of the Navy*, 240 F.3d 1009, 1014 (Fed. Cir. 2001)). All of these factors are present in the record.

First, as to proximity. YRMC produced the military's <u>January 9, 2019</u> notice

that it received regarding Dr. Mustafa's deployment that summer. 2-ER-34 (YRMC000138). Dr. Mustafa's Orders followed soon thereafter. 2-ER-36–48. Defendant Dr. Magu (for the first time) on <u>February 25, 2019</u> suggested that Dr. Mustafa <u>was being</u> (not "would be") "phased out" of the schedule. 2-ER-52. And almost simultaneously, Defending Magu was looking for complaints against Dr. Mustafa. 2-ER-48–50 (emails from February 2019). That is temporal proximity on steroids. It is also worthy of note that each alleged complaint listed in in the cited emails is <u>completely anonymous</u> and that <u>patients could not create them</u>. 2-ER-287–89 (115:17-116:9; 117:21-118:12). Furthermore, none of the complaints were apparently ever followed-up in the normal manner because they were "left open" for nearly a year until they were resent to Dr. Magu in 2020 – at his inferred request. 2-ER-48 (March 13, 2020 email). Certainly they were never addressed with Dr. Mustafa (2-ER-195–96, -198–200 (111:2-112:16; 114:8-116:16), <u>nor were they looked at again</u> until after YRMC was  looking for an alternate justification for their decision not to renew Dr. Mustafa's contract <u>after</u> they had <u>already met with and informed Dr. Mustafa he was not being re-employed</u>. *Compare* 2-ER-48 (March 13, 2020 at 12:10 p.m.) *with* 2-ER-63–4 (March 13, 2020 at 10:11 a.m.).

The next 2019 communication took place in November shortly after Dr. Mustafa's contract "expired" while he was on deployment. 2-ER-54; 2-ER-285 (107:1-108:17). Like with many of the emails, this one very much has a formal "let's paper the file to CYA" feel to it, as if someone (perhaps the general counsel Robert Seibel?) had requested specific documentation to shade the facts towards justifying terminating an active reservist <u>while he was on deployment</u>.

On February 27, 2020, Dr. Mustafa received his official return from active duty form. 2-ER-56. On February 29, 2020, Dr. Mustafa notifies YRMC that he will be returning home and ready to work starting March. 2-ER-58. This triggers the involvement of general counsel Robert "Bob" Siebel and explicit reference to Dr. Mustafa's deployment. 2-ER-61. Dr. Magu is kept updated on the meetings with Dr. Mustafa, who is clearly upset to be told that he no longer has a job. 2-ER-63–64. Of note, the sender of that email clearly makes it known that Dr. Magu was in on the decision. *Id.* ("As we discussed, we met with Dr. Mustafa..."). Again, with reference to HR and counsel. *Id.* <u>After</u> the meeting, the "open" patient complaints are dug for again, having gone unneeded and unaddressed since the prior February when YRMC learned of Dr. Mustafa's deployment. 2-ER-48. Of course, those "patient complaints" go completely unreferenced in any of YRMC's communications to the Department of Labor after Dr. Mustafa's USERRA complaint. 2-ER-70–71; 2-ER-73–74. And there is the strange final meeting email, where YRMC still contemplates using Dr. Mustafa on a part-time basis and considers a "new contract." 2-ER-55–67. Notably, Dr. Magu is reluctant. *Id.* Yet, <u>multiple</u> hospitalists are newly hired at YRMC (including specifically in February and March 2020) and others have their contracts renewed in 2020 (2-ER-291 (129:21-132:6); 2-ER-77) – the same timeframe in which YRMC tells Dr. Mustafa that <u>there is no need for him any longer</u>. 2-ER-203–05 (119:1-121:9). This nonrenewal of Dr. Mustafa's contract in this context is the adverse action.

Temporal proximity is sufficient to defeat summary judgment in this case. *See Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir. 2000)(stating that causation may be

inferred from timing of events). In *Scott v. Mabus*, 618 Fed. Appx. 897, 2015 WL 4440868 at *9 (9th Cir. July 21, 2015)(mem.), this Court reiterated that a four month span "falls easily" within the "three to eight" months time range that can support an inference of retaliation. In *Nidds v. Schindler Elevator Corporation*, 113 F.3d 912, 919 (9th Cir. 1996), this Court found a temporal proximity nexus in periods of one month and four months. In *Diederich v. Providence Health & Services,* 622 Fed. Appx. 613, 2015 WL 4638253 (9th Cir. 2015)(mem.), this Court found proximity in a seven month interval between the protected activity and the termination due to minor adverse actions occurring during the interval. *See also Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 507 (9th Cir. 2000)("evidence based on timing can be sufficient to let the issue go to the jury, even in the face of alternative reasons proffered by the defendant.).

Second, as to inconsistency and disparate treatment, during his termination meeting in March, the same individuals said to Dr. Mustafa that there was "no shift for any work" and that "we needed people to work back in November, December, but you were not here. So now we don't need to go to work, we have enough." 2-ER-203–05 (119:21-121:9 (emphasis added)). All of the other hospitalists who wanted one, got a new contract. Coupled with the temporal proximity, this should be more than enough to infer causation.

Third, Dr. Mustafa has more than timing and inconsistency alone. Both during his termination meeting and before his last deployment with YRMC, Dr. Mustafa experienced negative comments ("express hostility") related to his required absence, including specifically that he would not be chosen for leadership

due to his military service and "oh, you're going out <u>again</u>?" 2-ER-213–17 (129:19-133:21). Despite all this, the court below concluded: "there is nothing in the facts beyond Plaintiff's claim to suggest YRMC's decision not to renew the contract had anything to do with his military service." 1-ER-10. Dr. Mustafa has established his right to proceed on a prima facie case.

## B. **Dr. Mustafa Presented Factual Disputes Regarding YRMC's Pretextual Reasons For Termination.**

Similarly, Dr. Mustafa can show that the YRMC's alleged basis for the termination is pretextual. It is a poorly-represented employer who cannot articulate <u>some</u> other "lawful" reason why it would have made the decision to terminate an employee. And YRMC has done so in this case, citing a total of three reasons offered at various times pre- and post-litigation. The trial court allowed these to pass muster, but without drawing inferences in Dr. Mustafa's favor as required by law. As demonstrated below, Dr. Mustafa provided the trial court with adequate summary judgment evidence to create a question of fact whether these three reasons were pretextual.

This Court has offered a variety of ways for employees to show pretext. Pretext may be shown when (1) the reasons are so intertwined that a showing of pretext as to one raises a genuine question whether the remaining reason is valid; (2) the pretextual character of one explanation is "so fishy and suspicious," that a jury could "find that the employer (or its decisionmaker) lacks all credibility"; (3) the employer offers a plethora of reasons, and the plaintiff raises substantial doubt about a number of them; (4) the plaintiff discredits each of the employer's objective

explanations, leaving only subjective reasons to justify its decision; or (5) the employer has changed its explanation under circumstances that suggest dishonesty or bad faith. *Curley v. City of North Las Vegas*, 772 F.3d 629, 633 n.3 (9th Cir. 2014)(citations omitted).

"[A] plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Noyes v. Kelly Services,* 488 F.3d 1163, 1169-70 (9th Cir. 2007) (quoting, *inter alia*, *Chuang*, 225 F.3d at 1127). The Supreme Court noted that "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 147 (2000) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517 (1993)).

Importantly, <u>all</u> of the evidence as to pretext — whether direct or indirect — is to be considered "cumulatively." *Noyes,* 488 F.3d at 1170 (quoting *Raad v. Fairbanks North Star Borough School Dist.*, 323 F.3d 1185, 1194 (9th Cir. 2003)). Thus, the burden on plaintiffs to raise a triable issue of fact as to pretext is "hardly an onerous one." *Id.* (quoting *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997)). The burden is low because:

> Although some plaintiffs might discover direct evidence that a defendant's nondiscriminatory justification for an employment decision is a pretext, most will not. Defendants who articulate a nondiscriminatory explanation for a challenged employment decision

may have been careful to construct an explanation that is not contradicted by known direct evidence.

*Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1029 (9th Cir. 2006).

An employer whose reasons shift or change over time can be inferred to have given a pretextual reason for its action. *See Hernandez v. Hughes Missile Systems Co.*, 362 F.3d 564, 569 (9th Cir. 2004); *Payne,* 113 F.3d at 1080; *Lindahl v. Air France,* 930 F.3d 1434, 1438 (9th Cir. 1991); *see also E.E.O.C. v. Sears Roebuck & Co.,* 243 F.3d 846, 853 (4th Cir. 2001) ("[A] factfinder could infer from the late appearance of [the employer's] current justification that it is a post-hoc rationale, not a legitimate explanation for [its] decision…."); *Tyler v. RE/MAX Mountain States, Inc.,* 232 F.3d 808, 813 (10th Cir. 2000) ("We are disquieted ... by an employer who 'fully' articulates its reasons for the first time months after the decision was made."); *Dominguez-Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 432 (1st Cir. 2000)("[W]hen a company, at different times, gives different and arguably inconsistent explanations [regarding its reasons for terminating an employee], a jury may infer that the articulated reasons are pretextual."); *Thurman v. Yellow Freight Sys., Inc.,* 90 F.3d 1160, 1167 (6th Cir. 1996) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext.").

Here, the shifting explanations, post-hoc reasoning, and obvious efforts at creating a paper trail (while at the same time keeping that paper trail hidden far away from Dr. Mustafa's eyes) show that YRMC and Dr. Magu were committed to getting rid of Dr. Mustafa as soon as his deployment orders came through. And perhaps, even Pam Orendorff was instructed to focus Dr. Mustafa on the "benefits" of

signing a "contractor" agreement rather than the employment agreement. 2-ER-143–45 (59:13-61:1). But here is plenty in the record to infer that the reason Dr. Mustafa is no longer at YRMC was motivated by his absences due to his monthly military training and his deployment in 2019-2020. This is precisely what the law forbids at both the state and federal level.

YRMC proffered three explanations for Dr. Mustafa's termination/nonrenewal: patient complaints, the expired contract with no "contemporaneous" request for renewal from Dr. Mustafa, and the new hospitalist hires eliminating any further need for Dr. Mustafa. Each falls apart when examined in context.

### 1. *"Anonymous Patient Complaints"*

As to the supposed justification for "not renewing" Dr. Mustafa's contract, the hospital's produced emails show that the information regarding "patient complaints" was solicited in a way to suggest that it was done after the decision to "phase out" Dr. Mustafa was already made – in other words, the post-hoc rationale to avoid being seen as discriminating against a deployed service member was to search out previously-unknown patient complaints "throughout his tenure" as YRMC put it below. Of course, YRMC did not mention these complaints to the Department of Labor in response to the USERRA complaint. 2-ER-70–71; 2-ER-73–74. YRMC also carefully avoided any evidence or even a mild representation to the trial court that Dr. Mustafa received "more" complaints than other hospitalists. YRMC produced no comparator evidence to show that Dr. Mustafa received complaints at any greater rate or frequency than any other hospitalist. Nor was Dr.

Mustafa ever written up, coached, or disciplined in any way related to a patient or staff complaint. 2-ER-252–53 (168:19-169:7). And as a final nail in the complaint coffin – some of the complaints allegedly relied upon predate Dr. Mustafa being offered the 2016 agreement with YRMC. 2-ER-300 (165:18-24). Yet YRMC suggests that the same complaints that existed at the time Dr. Mustafa was offered his contract were the same complaints that justified its non-renewal. The trial court oddly suggested that this fact cuts both ways: "While Plaintiff argues that because some complaints predated the [2016 Agreement], it 'strains credulity' that those same complaints could support YRMC's decision not to extend a new contract in 2019. [] However, the reverse is also true: Plaintiff was in the Army at the time he entered the ICA, and he had deployed previously in 2013." 1-ER-12 n.5 (citations omitted). This fact does not cut both ways because it would have been illegal for YRMC to refuse him a contract along with everyone else because of his military service. As the trial court said, it had been six years since he had last deployed, back when he was working under a previous agreement. *See* 5-ER-1009–38. Now, starting in 2016, YRMC begins direct contractual privity with its hospitalists, yet did not reference or address or apparently even look for any such complaints until it got notice of Dr. Mustafa's impending deployment in 2019. After reemployment, USERRA regulations limit discharge to those situations involving "cause," but it is the employer's burden to show that the employee had notice of the conduct in question and that it would constitute "cause." 20 C.F.R. § 1002.248. Here, YRMC has not demonstrated that the post-litigation-referenced complaints were ever addressed with Dr. Mustafa or that he had any notice of them.

### 2. *"Dr. Mustafa Didn't Reach Out"*

YRMC also argued below that Dr. Mustafa did not actively seek to "renegotiate" his contract. Immaterial. His previous experience with the hospital was that the hospital's contract manager Pam Orendorff (also YRMC's 30(b)(6) representative) would contact him at or near the time of expiration and send the new contract as a matter of course. 2-ER-138–39 (54:12-55:6). Ms. Orendorff admitted the same. 2-ER-299 (162:16-163:14). It was simply not something on Dr. Mustafa's radar after almost 15 years of consistent employment, punctuated only by his monthly military service (2-ER-224 (140:7-16)) and his occasional deployment. USERRA regulations state that Dr. Mustafa was not even required to announce his intent to seek reemployment before leaving. 20 C.F.R. § 1002.88. YRMC has not articulated a shred of evidence or argument that Dr. Mustafa could have <u>actually</u> handled the negotiation process while on deployment. Nor is there any evidence that YRMC somehow would have granted him a renewed contract <u>if only</u> he had reached out while on active duty. Remember: the discriminatory decision to "phase out" Dr. Mustafa from the schedule was already made by Dr. Magu way back in February 2019. 2-ER-52.

The longtime practice (and "benefit" under 38 U.S.C. § 4303(2)) at YRMC was to renew any hospitalist's contract who wanted to be there. 2-ER-280 (88:17-89:21). <u>Only Dr. Mustafa</u>, "inconveniently" absent on deployment or in monthly military trainings when YRMC wanted him at work, was non-renewed. *Id.*

### 3. *"We Don't Need You Anymore."*

The justification (made to Dr. Mustafa directly back in 2020) was that YRMC

no longer needed Dr. Mustafa's services. 2-ER-203–04 (119:21-120:2). However, YRMC hired multiple hospitalists to replace Dr. Mustafa in 2019-20. 2-ER-77, -79, -297 (155:4-25). And YRMC has hired more hospitalists since. 2-ER-293 (137:22-138:5). YRMC even requested "extra" hospitalists via the *locum tenens* process in 2021 – but rejected Dr. Mustafa when he agreed to serve. 2-ER-81-87. Yet, despite the conflicting evidence with YRMC telling Dr. Mustafa that there was no work available for him, the trial court decided there was "not enough to get to the jury." 1-ER-15.

As courts in other circuits have recognized "If mere replacement of the employee would exempt an employer from [USERRA], its protections would be meaningless." *Mace v. Willis*, 259 F.Supp.3d 1007, 1016-17 (D. S.D. 2017) (quoting *Davis v. Crothall Serv. Grp., Inc.*, 961 F.Supp.2d 716, 727 (W.D. Pa. 2013) and *Cole v. Swint*, 961 F.2d 58, 60 (5th Cir. 1992)). "USERRA requires that 'the employee should be restored to his position even though he has been temporarily replaced by a substitute who has been able...to make it desirable to make the change permanent.'" *Davis*, 961 F.Supp.2d at 731 (quoting *Kay v. Gen. Cable Corp.*, 144 F.2d 653, 655–56 (3d Cir. 1944)). The same is true for non-temporary replacements. *Davis*, 961 F.Supp.2d at 730 (citing 20 C.F.R. § 1002.139(a)); *see also Nichols v. Dept. of Veterans Affairs*, 11 F.3d 160, 163 (Fed. Cir. 1993)("A returning veteran will not be denied his rightful position because the employer will be forced to displace another employee."); *Goggin v. Lincoln St. Louis*, 702 F.2d 698, 703–04 (8th Cir. 1983)(an employer cannot claim as a defense that it will be required to "bump" or demote one of its present employees.)

YRMC and its in-house counsel apparently tried to carefully steer the ship to avoid liability (including by having the contract administrator tout the benefits of the "independent contractor" agreement versus the employment agreement. 2-ER-143–48 (59:13-61:1; 61:14-63:1; 63:19-64:2); -154 (70:2-12); -250–251(166:20-167:7). But by arguing that Dr. Mustafa (and <u>only</u> Dr. Mustafa) was no longer needed due to increased hiring, YRMC has all but admitted liability.

Dr. Mustafa was eligible for reemployment upon his return. 38 U.S.C. § 4312. Dr. Mustafa should have been protected from discrimination because of his military service. 38 U.S.C. § 4312; A.R.S. §§ 23-1501, 26-167, 26-168. Unfortunately, the trial court glossed over the material facts in the record that would have established Dr. Mustafa's right to a trial on this issue. This Court should reverse and remand for trial on the USERRA and AEPA claims.

## V. DR. MUSTAFA'S STATE LAW CLAIMS SHOULD HAVE SURVIVED SUMMARY JUDGMENT.

### A. <u>Disputed Material Facts Regarding Good Faith and Fair Dealing</u>

As referenced frequently, YRMC testified that, basically, everyone who wanted a new contract got one. 2-ER-280 (88:17-89:21). The clear practice was to have long-tenured hospitalists and renew their employment regularly. In essence, the question that should absolutely go to the jury is whether Dr. Mustafa had a reasonable expectation of continued work with the hospital. *Nolan v. Starlight Pines Homeowners Ass'n*, 167 P.3d 1277, 1284, 216 Ariz. 482, 489 (Ariz. App. 2007)("A party may breach the implied covenant even in the absence of a breach of an express provision of the contract by denying the other party the reasonably expected benefits

of the agreement."). Given that it appears to have been Dr. Magu's intent to get rid of Dr. Mustafa <u>during</u> his contracting period (2-ER-48–50 & -52) and that YRMC clearly needed (and hired new and renewed agreements almost without exception for) hospitalists at the very time it was claiming to Dr. Mustafa's face that it didn't need him anymore, there is a question of fact here as to whether Dr. Mustafa received the benefit of the bargain he had made and whether YRMC acted in good faith towards him. Clearly, there was contemplation of continued employment <u>even up to March 2020</u>, until YRMC pulled the plug at the last minute. 2-ER-66–67. And the reason for that "non-renewal" as it is consistently described until Dr. Mustafa mentioned his rights (2-ER-63–64), <u>is fully revealed in writing</u>: "our provider who was sent out on deployment" with the response from HR recommending involving the general counsel. 2-ER-60–61. This is plenty for a jury to conclude that the unspoken (or unproduced) efforts to get rid of Dr. Mustafa were not done fairly or in good faith.

YRMC has not demonstrated that they had no work for Dr. Mustafa – the record reveals they needed <u>more</u> hospitalists continuously throughout 2020 and 2021 – but specifically rejected Dr. Mustafa at every turn. Dr. Mustafa had the reasonable expectation, based on his longstanding relationship with YRMC, their ongoing need for hospitalists, and their practice of renewing <u>everyone's</u> contracts, that his contract would be renewed, even if (or especially if) it expired while out on deployment This claim should go to the jury.

## B. <u>Disputed Material Facts Regarding Interference with Business Expectancies.</u>

This claim affects Dr. Magu only, who began the plan to "phase out" of Dr. Mustafa in February 2019, and finished the job "as discussed" in March 2020. At the trial court, Dr. Magu attempted to recast this tort claim as solely limited to interference with an existing contract that he then argued had "expired." This is not Dr. Mustafa's pleading, which specifically includes "business expectancies." 5-ER-1091–2 (¶¶ 57-58). The Arizona tort is often described as improper interference with "valid contractual relationship <u>or business expectancy</u>." *Wagenseller v. Scottsdale Mem'l Hosp.*, 710 P.2d 1025, 1041, 147 Ariz. 370, 386 (1985) (emphasis added). Requiring a contract to exist would render superfluous the Arizona Supreme Court's phrasing regarding "expectancy." To prove this tort, a plaintiff must show: "the existence of a valid contractual relationship <u>or business expectancy</u>; the interferer's knowledge of the relationship <u>or expectancy</u>; intentional interference inducing or causing a breach or termination of the relationship <u>or expectancy</u>; and resultant damage to the party whose relationship <u>or expectancy</u> has been disrupted.... In addition, the interference must be improper as to motive or means before liability will attach. *Neonatology Associates v. Phoenix Perinatal Assoc., Inc.*, 164 P.3d 691, 693 (Ariz. App. 2007) (quoting *Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of Governors*, 909 P.2d 486, 494, 184 Ariz. 419, 427 (App.1995)) (citations omitted and emphasis added).

Division Two of the Arizona Court of Appeals notes that the expectancy must be more than a "mere hope," but rather a "colorable economic relationship between

the plaintiff and a third party with the potential to develop into a full contractual relationship. *Dube v. Likins*, 167 P.3d 93, 101, 216 Ariz. 406, 414 (Ariz. App. 2007); *see also Bar J Bar Cattle Co., Inc. v. Pace*, 763 P.2d 545, 550, 158 Ariz. 481, 486 (Ariz. App. 1988).

As a result of this dual development of the tort (contract and expectancy) in case law, even the RESTATEMENT (THIRD) OF TORTS has been updated to include what Arizona law already recognizes:

**Section 18 Interference with Economic Expectation**

A defendant is subject to liability for interference with economic expectation if:

1. the plaintiff had a reasonable expectation of an economic benefit from a relationship with a third party;

2. the defendant committed an independent and intentional legal wrong;

3. the defendant intended to interfere with the plaintiff's expectation;

4. the defendant's wrongful conduct caused the expectation to fail; and

5. the plaintiff suffered economic loss as a result.

RESTATEMENT (THIRD) OF TORTS § 18.

Given the almost automatic renewal rate for hospitalists at YRMC, Dr. Magu's decision to (in his words) "phase out" Dr. Mustafa (2-ER-52) in February 2019 is a clear sign that he a) knew that Dr. Mustafa was expecting to work; and b) was directly involved in harming Dr. Mustafa's business expectancy on the grounds of Dr. Mustafa's military service and deployment. And then again in March, Dr. Magu was clearly part of the "discussion" on not renewing Dr. Mustafa's contract

when he returned. 2-ER-63. Due to the long-standing economic relationship between Dr. Mustafa and YRMC, Dr. Magu knew that the expectation was that Dr. Mustafa's contract would be renewed as it had been so many times before. Arizona's public policy regarding the protections for military service absolutely makes that an improper motive, and the use of undisclosed patient complaints as an undisclosed justification is an improper means, as well as hiring several hospitalists in the same position at the same time as Dr. Mustafa was expected to return.

Dr. Magu's direct participation creates the inference that he interfered with Dr. Mustafa's expectancy with YRMC and prevented his contract renewal based on Dr. Mustafa's military service. This claim should proceed to trial.

## C. <u>Disputed Material Facts Regarding Aiding and Abetting.</u>

This claim also just involves Dr. Magu, who aided and abetted YRMC in the commission of its torts of wrongful termination and breach of the covenant of good faith and fair dealing against Dr. Mustafa. Arizona recognizes "aiding and abetting" as embodied in RESTATEMENT (SECOND) OF TORTS § 876(b), that a person who aids and abets a tortfeasor is himself liable for the resulting harm to a third person. *Wells Fargo Bank v. Arizona Laborers*, 38 P.3d 12, 23 (Ariz. 2002) (and cases cited).

Claims of aiding and abetting tortious conduct require proof of three elements:

(1) the primary tortfeasor must commit a tort that causes injury to the plaintiff;

(2) the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty; and

(3) the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach.

*Id.* YRMC argues that there is no proof of "knowing improper conduct" on Dr. Magu's part. However, ever since Arizona became a state it has been the rule that "Every person is presumed to know the law, and its requirements. A mistake as to the requirements of the law is no excuse for a failure to meet its requirements." *Newman v. Fidelity Savings & Loan Ass'n*, 128 P. 53, 14 Ariz. 354 (Ariz. 1912). Dr. Magu is presumed to know that refusing to renew a contract <u>that otherwise would have been renewed</u> due to a person's military service and deployment is absolutely against federal and state law. This is especially true where federal law requires that notice of USERRA rights be posted in the workplace. 38 U.S.C. § 4334(a)("Requirement to provide notice.—Each employer shall provide to persons entitled to rights and benefits under this chapter a notice of the rights, benefits, and obligations of such persons and such employers under this chapter. The requirement for the provision of notice under this section may be met by the posting of the notice where employers customarily place notices for employees."). Between Dr. Magu's direct action in "phasing out" Dr. Mustafa (2-ER-52), and his obvious participation in the process given the number of emails in the record that are directed to him for input and referencing his "discussion," and the improper motive of taking action because of someone's military service, Dr. Magu has "aided and abetted" YRMC's tortious conduct against Dr. Mustafa to a degree that should send this claim to the jury as well.

## CONCLUSION

The economic realities reveal that Dr. Mustafa was YRMC's "employee" for purposes of USERRA and the AEPA as a matter of law. In fact, it is difficult to

imagine a situation in which Dr. Mustafa would have been any more dependent upon YRMC from an economic perspective as he sought to return to work immediately upon his release from military service, only to find that YRMC had specifically replaced him, and continued to hire hospitalists even after he was told that there was "no work" available for him to perform. There is enough in the summary judgment record for this Court to conclude *de novo* that YRMC leadership did not like it when Dr. Mustafa was gone, as evidenced by the comments made to that effect and the decisions resulting from it. The ultimate decision to "not renew" Dr. Mustafa's contract, clearly guided, aided and abetted, by Dr. Magu with the not-so-hidden involvement of the hospital's general counsel along the way, was tortious and caused Dr. Mustafa significant damages. Viewed in the light most favorable to Dr. Mustafa as it must be, Dr. Mustafa provided sufficient summary judgment evidence to negate YRMC's arguments and create genuine issues of material fact for trial. Accordingly, Dr. Mustafa respectfully requests that the Court a) hold that he was an employee of YRMC for purposes of all claims, b) reverse the trial court's grant of summary judgment to YRMC and Dr. Magu, and c) remand the case for trial.

RESPECTFULLY SUBMITTED this 17th day of July, 2023,

By: s/Joshua W. Carden
Joshua W. Carden
Arizona State Bar No. 021698
CARDEN LIVESAY, LTD.
419 E. Juanita Ave., Ste. 103
Mesa, AZ 85204
Phone: 480-345-9500
Email: joshua@cardenlivesay.com
*Attorney for Appellant Dr. Yulius Mustafa*

# ADDENDUM - PERTINENT STATUTES AND REGULATIONS

## 38 U.S.C. § 4301(a) – "Purpose"

The purposes of this chapter are—

(1) to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service;

(2) to minimize the disruption to the lives of persons performing service in the uniformed services as well as to their employers, their fellow employees, and their communities, by providing for the prompt reemployment of such persons upon their completion of such service; and

(3) to prohibit discrimination against persons because of their service in the uniformed services.

## 38 U.S.C. § 4303(3) – "Definitions"

The term "employee" means any person employed by an employer. Such term includes any person who is a citizen, national, or permanent resident alien of the United States employed in a workplace in a foreign country by an employer that is an entity incorporated or otherwise organized in the United States or that is controlled by an entity organized in the United States, within the meaning of section 4319(c) of this title.

## 38 U.S.C. § 4311 – "Discrimination against persons who serve in the uniformed services and acts of reprisal prohibited"

(a) A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

(b) An employer may not discriminate in employment against or take any adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter, (2) has testified or otherwise made a statement in or in connection with any proceeding under this chapter, (3) has assisted or otherwise participated in an investigation under this chapter, or (4) has exercised a right provided for in this chapter. The prohibition in this subsection shall apply with respect to a person regardless of whether that person has performed service in the uniformed services.

(c) An employer shall be considered to have engaged in actions prohibited—

(1) under subsection (a), if the person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service; or

(2) under subsection (b), if the person's (A) action to enforce a protection afforded any person under this chapter, (B) testimony or making of a statement in or

in connection with any proceeding under this chapter, (C) assistance or other participation in an investigation under this chapter, or (D) exercise of a right provided for in this chapter, is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such person's enforcement action, testimony, statement, assistance, participation, or exercise of a right.

(d) The prohibitions in subsections (a) and (b) shall apply to any position of employment, including a position that is described in section 4312(d)(1)(C) of this title.

## 38 U.S. Code § 4312 – "Reemployment rights of persons who serve in the uniformed services"

(a) Subject to subsections (b), (c), and (d) and to section 4304, any person whose absence from a position of employment is necessitated by reason of service in the uniformed services shall be entitled to the reemployment rights and benefits and other employment benefits of this chapter if—

(1) the person (or an appropriate officer of the uniformed service in which such service is performed) has given advance written or verbal notice of such service to such person's employer;

(2) the cumulative length of the absence and of all previous absences from a position of employment with that employer by reason of service in the uniformed services does not exceed five years; and

(3) except as provided in subsection (f), the person reports to, or submits an

application for reemployment to, such employer in accordance with the provisions of subsection (e).

....

(d)

(1) An employer is not required to reemploy a person under this chapter if—

(A) the employer's circumstances have so changed as to make such reemployment impossible or unreasonable;

(B) in the case of a person entitled to reemployment under subsection (a)(3), (a)(4), or (b)(2)(B) of section 4313, such employment would impose an undue hardship on the employer; or

(C) the employment from which the person leaves to serve in the uniformed services is for a brief, nonrecurrent period and there is no reasonable expectation that such employment will continue indefinitely or for a significant period.

(2) In any proceeding involving an issue of whether—

(A) any reemployment referred to in paragraph (1) is impossible or unreasonable because of a change in an employer's circumstances,

(B) any accommodation, training, or effort referred to in subsection (a)(3), (a)(4), or (b)(2)(B) of section 4313 would impose an undue hardship on the employer, or

(C) the employment referred to in paragraph (1)(C) is for a brief, nonrecurrent period and there is no reasonable expectation that such employment will continue indefinitely or for a significant period,

the employer shall have the burden of proving the impossibility or

unreasonableness, undue hardship, or the brief or nonrecurrent nature of the employment without a reasonable expectation of continuing indefinitely or for a significant period.

(e)

(1) Subject to paragraph (2), a person referred to in subsection (a) shall, upon the completion of a period of service in the uniformed services, notify the employer referred to in such subsection of the person's intent to return to a position of employment with such employer as follows:

(A) In the case of a person whose period of service in the uniformed services was less than 31 days, by reporting to the employer—

(i) not later than the beginning of the first full regularly scheduled work period on the first full calendar day following the completion of the period of service and the expiration of eight hours after a period allowing for the safe transportation of the person from the place of that service to the person's residence; or

(ii) as soon as possible after the expiration of the eight-hour period referred to in clause (i), if reporting within the period referred to in such clause is impossible or unreasonable through no fault of the person.

(B) In the case of a person who is absent from a position of employment for a period of any length for the purposes of an examination to determine the person's fitness to perform service in the uniformed services, by reporting in the manner and time referred to in subparagraph (A).

(C) In the case of a person whose period of service in the uniformed services was for more than 30 days but less than 181 days, by submitting an application for

reemployment with the employer not later than 14 days after the completion of the period of service or if submitting such application within such period is impossible or unreasonable through no fault of the person, the next first full calendar day when submission of such application becomes possible.

(D)In the case of a person whose period of service in the uniformed services was for more than 180 days, by submitting an application for reemployment with the employer not later than 90 days after the completion of the period of service.

….

(h)In any determination of a person's entitlement to protection under this chapter, the timing, frequency, and duration of the person's training or service, or the nature of such training or service (including voluntary service) in the uniformed services, shall not be a basis for denying protection of this chapter if the service does not exceed the limitations set forth in subsection (c) and the notice requirements established in subsection (a)(1) and the notification requirements established in subsection (e) are met.

**A.R.S. § 23-1501 – "Severability of employment relationships; protection from retaliatory discharges; exclusivity of statutory remedies in employment"**

A. The public policy of this state is that:

1. The employment relationship is contractual in nature.

2. The employment relationship is severable at the pleasure of either the employee or the employer unless both the employee and the employer have signed a written contract to the contrary setting forth that the employment relationship shall

remain in effect for a specified duration of time or otherwise expressly restricting the right of either party to terminate the employment relationship. Both the employee and the employer must sign this written contract, or this written contract must be set forth in the employment handbook or manual or any similar document distributed to the employee, if that document expresses the intent that it is a contract of employment, or this written contract must be set forth in a writing signed by the party to be charged. Partial performance of employment shall not be deemed sufficient to eliminate the requirements set forth in this paragraph. Nothing in this paragraph shall be construed to affect the rights of public employees under the Constitution of Arizona and state and local laws of this state or the rights of employees and employers as defined by a collective bargaining agreement.

3. An employee has a claim against an employer for termination of employment only if one or more of the following circumstances have occurred:

....

(b) The employer has terminated the employment relationship of an employee in violation of a statute of this state. If the statute provides a remedy to an employee for a violation of the statute, the remedies provided to an employee for a violation of the statute are the exclusive remedies for the violation of the statute or the public policy set forth in or arising out of the statute, including the following:

...

All definitions and restrictions contained in the statute also apply to any civil action based on a violation of the public policy arising out of the statute. If the statute does not provide a remedy to an employee for the violation of the statute, the

employee shall have the right to bring a tort claim for wrongful termination in violation of the public policy set forth in the statute.

(c) The employer has terminated the employment relationship of an employee in retaliation for any of the following:

….

(vii) Service in the national guard or armed forces as protected by sections 26-167 and 26-168.


## A.R.S. § 26-167 – "Employment discrimination against national guard members prohibited; physical or economic duress to deter enlistment prohibited; violation; classification"

A. A member of the national guard shall not, because of membership therein or absence from employment under competent military orders, be deprived of employment or prevented or obstructed in obtaining employment in his trade, occupation or profession, nor shall any person be dissuaded from enlisting in the military forces of the state or the United States by threat of or actual infliction of physical punishment or economic damage.

B. A person violating this section is guilty of a class 2 misdemeanor.


## A.R.S. §26-168 – "Absence from employment for military duty; vacation and seniority rights; violation; classification; definition"

A. An employer may not refuse to allow members of the national guard of this state or any other state or the United States armed forces reserves to take leaves of

absence from employment for the purpose of complying with competent orders of this state, the other state or the United States for active duty or to attend camps, maneuvers, formations or armory drills. The leaves of absence may not affect vacation rights that employees otherwise have, except that an employer need not consider the period of absence as a period of work in determining eligibility for vacation and the amount of vacation pay to which the employee is entitled.

B. A member of the national guard of this state or any other state or the United States armed forces reserves may not lose seniority or precedence while absent under competent military orders. On return to employment, the employee shall be returned to the employee's previous position or to a higher position commensurate with the employee's ability and experience as seniority or precedence would ordinarily entitle the employee.

C. An officer or employee of this state, or any department or political subdivision of this state, who is a member of the national guard of this state or any other state or the United States armed forces reserves is entitled to leave of absence pursuant to section 38-610 from the individual's duties without loss of time or efficiency rating on all days during which the individual is engaged in field training as provided by this chapter. For the period of the leave of absence, the individual is entitled to pay as prescribed in section 38-610, subsection C, paragraph 3. For the purposes of this subsection, an officer or employee may not be charged military leave for days on which the individual was not otherwise scheduled for work.

D. When ordered to perform active duty or training by the competent orders of any state or the United States, members of the national guard or United States

armed forces reserves have the protections afforded to persons under federal active duty by the soldiers and sailors civil relief act of 1940 (54 Stat. 1178; 50 United States Code App. sections 501 through 548 and 560 through 591) and by the uniformed services employment and reemployment rights act of 1994 (108 Stat. 3149; 38 United States Code sections 4301 through 4333).

E. A person that violates subsection A or B of this section is guilty of a class 1 misdemeanor. The county attorney shall prosecute violations of this section in superior court.

F. For the purposes of this section, "day" means a shift of work.

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Appellant states that he is unaware of any related case pending in this Court.

Dated: July 17, 2023

By: s/Joshua W. Carden
Joshua W. Carden
*Attorney for Appellant Dr. Yulius Mustafa*

# CERTIFICATE OF COMPLIANCE

I am the attorney or self-represented party.

This brief contains 13,997 words, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 32-1.

Dated: July 17, 2023

<u>s/ Joshua W. Carden</u>

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: July 17, 2023

s/ Joshua W. Carden